(Slip Opinion)     OCTOBER TERM, 2010     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ASHCROFT *v.* AL-KIDD

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 10–98.   Argued March 2, 2011—Decided May 31, 2011

Respondent al-Kidd alleges that, after the September 11th terrorist attacks, then-Attorney General Ashcroft authorized federal officials to detain terrorism suspects using the federal material-witness statute, 18 U. S. C. §3144.  He claims that this pretextual detention policy led to his material-witness arrest as he was boarding a plane to Saudi Arabia.  To secure the warrant, federal officials had told a Magistrate Judge that information "crucial" to Sami Omar al-Hussayen's prosecution would be lost if al-Kidd boarded his flight.  Prosecutors never called al-Kidd as a witness, and (as he alleges) never meant to do so.  Al-Kidd filed suit pursuant to *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388, challenging the constitutionality of Ashcroft's alleged policy.  The District Court denied Ashcroft's motion to dismiss on absolute and qualified immunity grounds.  The Ninth Circuit affirmed, holding that the Fourth Amendment prohibits pretextual arrests absent probable cause of criminal wrongdoing, and that Ashcroft could not claim qualified or absolute immunity.

*Held*:

   1. The objectively reasonable arrest and detention of a material witness pursuant to a validly obtained warrant cannot be challenged as unconstitutional on the basis of allegations that the arresting authority had an improper motive.  Pp. 3–9.

    (a) Qualified immunity shields a government official from money damages unless (1) the official violated a statutory or constitutional right, and (2) that right was "clearly established" at the time of the challenged conduct.  *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818.  Where, as here, a court considers both prongs of this inquiry, this

Court has the discretion to correct the lower court's errors at each step.  P. 3.

(b) Whether a detention is reasonable under the Fourth Amendment "is predominantly an objective inquiry." *Indianapolis* v. *Edmond*, 531 U. S. 32, 47.  Courts ask whether "the circumstances, viewed objectively, justify [the challenged] action." *Scott* v. *United States*, 436 U. S. 128, 138.  Except for cases that involve special-needs, *e.g., Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646, 653, or administrative searches, *e.g., Michigan* v. *Clifford*, 464 U. S. 287, 294, this Court has almost uniformly rejected invitations to probe subjective intent.  The Court of Appeals was mistaken in believing that *Edmond* established that "'programmatic purpose' is relevant to Fourth Amendment analysis of programs of seizures without probable cause."  580 F. 3d 949, 968.  It was not the absence of probable cause that triggered *Edmond*'s invalidating-purpose inquiry, but the checkpoints' failure to be based on "individualized suspicion."  531 U. S., at 47.  Here a neutral Magistrate Judge issued a warrant authorizing al-Kidd's arrest, and the affidavit accompanying the warrant application gave individualized reasons to believe that he was a material witness who would soon disappear.  A warrant based on individualized suspicion grants more protection than existed in most of this Court's cases eschewing inquiries into intent, *e.g., Whren* v. *United States*, 517 U. S. 806, 813, and *Terry* v. *Ohio*, 392 U. S. 1, 21–22.  Al-Kidd's contrary, narrow reading of those cases is rejected.  Because he concedes that individualized suspicion supported the issuance of the material-witness arrest warrant; and does not assert that his arrest would have been unconstitutional absent the alleged pretext; there is no Fourth Amendment violation here.  Pp. 3–9.

2. Ashcroft did not violate clearly established law and thus is entitled to qualified immunity.  A Government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." *Anderson* v. *Creighton*, 483 U. S. 635, 640.  Here, the asserted constitutional right falls far short of that threshold.  At the time of al-Kidd's arrest, not a single judicial opinion had held that pretext could render an objectively reasonable arrest pursuant to a material-witness warrant unconstitutional.  The Ninth Circuit's reliance on a District Court's footnoted dictum, irrelevant cases from this Court, and the Fourth Amendment's broad purposes and history is rejected.  Because Ashcroft did not violate clearly established law, the question whether he enjoys absolute immunity need not be addressed.  Pp. 9–12.

580 F. 3d 949, reversed and remanded.

Syllabus

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, and ALITO, JJ., joined. KENNEDY, J., filed a concurring opinion, in which GINSBURG, BREYER, and SOTOMAYOR, JJ., joined as to Part I. GINSBURG, J., filed an opinion concurring in the judgment, in which BREYER and SOTOMAYOR, JJ., joined. SOTOMAYOR, J., filed an opinion concurring in the judgment, in which GINSBURG and BREYER, JJ., joined. KAGAN, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–98

JOHN D. ASHCROFT, PETITIONER *v.* ABDULLAH AL-KIDD

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 31, 2011]

JUSTICE SCALIA delivered the opinion of the Court.

We decide whether a former Attorney General enjoys immunity from suit for allegedly authorizing federal prosecutors to obtain valid material-witness warrants for detention of terrorism suspects whom they would otherwise lack probable cause to arrest.

I

The federal material-witness statute authorizes judges to "order the arrest of [a] person" whose testimony "is material in a criminal proceeding . . . if it is shown that it may become impracticable to secure the presence of the person by subpoena." 18 U. S. C. §3144. Material witnesses enjoy the same constitutional right to pretrial release as other federal detainees, and federal law requires release if their testimony "can adequately be secured by deposition, and if further detention is not necessary to prevent a failure of justice." *Ibid.*

Because this case arises from a motion to dismiss, we accept as true the factual allegations in Abdullah al-Kidd's complaint. The complaint alleges that, in the aftermath of the September 11th terrorist attacks, then-Attorney Gen-

eral John Ashcroft authorized federal prosecutors and law enforcement officials to use the material-witness statute to detain individuals with suspected ties to terrorist organizations. It is alleged that federal officials had no intention of calling most of these individuals as witnesses, and that they were detained, at Ashcroft's direction, because federal officials suspected them of supporting terrorism but lacked sufficient evidence to charge them with a crime.

It is alleged that this pretextual detention policy led to the material-witness arrest of al-Kidd, a native-born United States citizen. FBI agents apprehended him in March 2003 as he checked in for a flight to Saudi Arabia. Two days earlier, federal officials had informed a Magistrate Judge that, if al-Kidd boarded his flight, they believed information "crucial" to the prosecution of Sami Omar al-Hussayen would be lost. App. 64. Al-Kidd remained in federal custody for 16 days and on supervised release until al-Hussayen's trial concluded 14 months later. Prosecutors never called him as a witness.

In March 2005, al-Kidd filed this *Bivens* action, see *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971) to challenge the constitutionality of Ashcroft's alleged policy; he also asserted several other claims not relevant here against Ashcroft and others. Ashcroft filed a motion to dismiss based on absolute and qualified immunity, which the District Court denied. A divided panel of the United States Court of Appeals for the Ninth Circuit affirmed, holding that the Fourth Amendment prohibits pretextual arrests absent probable cause of criminal wrongdoing, and that Ashcroft could not claim qualified or absolute immunity. See 580 F. 3d 949 (2009).

Judge Bea dissented, 580 F. 3d, at 981, and eight judges dissented from the denial of rehearing en banc, see 598 F. 3d 1129, 1137, 1142 (CA9 2010). We granted certiorari, see 562 U. S. ___ (2010).

II

Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct. *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982). We recently reaffirmed that lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first. See *Pearson* v. *Callahan*, 555 U. S. 223, 236 (2009).

Courts should think carefully before expending "scarce judicial resources" to resolve difficult and novel questions of constitutional or statutory interpretation that will "have no effect on the outcome of the case." *Id.,* at 236–237; see *id.,* at 237–242. When, however, a Court of Appeals does address both prongs of qualified-immunity analysis, we have discretion to correct its errors at each step. Although not necessary to reverse an erroneous judgment, doing so ensures that courts do not insulate constitutional decisions at the frontiers of the law from our review or inadvertently undermine the values qualified immunity seeks to promote. The former occurs when the constitutional-law question is wrongly decided; the latter when what is not clearly established is held to be so. In this case, the Court of Appeals' analysis at both steps of the qualified-immunity inquiry needs correction.

A

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." An arrest, of course, qualifies as a "seizure" of a "person" under this provision, *Dunaway* v. *New York*, 442 U. S. 200, 207–208 (1979), and so must be reasonable under the circumstances. Al-Kidd does not assert that Government officials would have acted unreasonably if they had used a

material-witness warrant to arrest him for the purpose of
securing his testimony for trial.  See Brief for Respondent
16–17; Tr. of Oral Arg. 20–22.  He contests, however (and
the Court of Appeals here rejected), the reasonableness of
using the warrant to detain him as a suspected criminal.

Fourth Amendment reasonableness "is predominantly
an objective inquiry."  *Edmond, supra*, at 47.  We ask
whether "the circumstances, viewed objectively, justify
[the challenged] action."  *Scott* v. *United States*, 436 U. S.
128, 138 (1978).  If so, that action was reasonable "*whatever* the subjective intent" motivating the relevant officials.  *Whren* v. *United States*, 517 U. S. 806, 814 (1996).
This approach recognizes that the Fourth Amendment
regulates conduct rather than thoughts, *Bond* v. *United
States*, 529 U. S. 334, 338, n. 2 (2000); and it promotes
evenhanded, uniform enforcement of the law, *Devenpeck* v.
*Alford*, 543 U. S. 146, 153–154 (2004).

Two "limited exception[s]" to this rule are our special-needs and administrative-search cases, where "actual
motivations" do matter.  *United States* v. *Knights*, 534
U. S. 112, 122 (2001) (internal quotation marks omitted).
A judicial warrant and probable cause are not needed
where the search or seizure is justified by "special needs,
beyond the normal need for law enforcement," such as the
need to deter drug use in public schools, *Vernonia School
Dist. 47J* v. *Acton*, 515 U. S. 646, 653 (1995) (internal
quotation marks omitted), or the need to assure that
railroad employees engaged in train operations are not
under the influence of drugs or alcohol, *Skinner* v. *Railway
Labor Executives' Assn.*, 489 U. S. 602 (1989); and where
the search or seizure is in execution of an administrative
warrant authorizing, for example, an inspection of fire-damaged premises to determine the cause, *Michigan* v.
*Clifford*, 464 U. S. 287, 294 (1984) (plurality opinion), or
an inspection of residential premises to assure compliance
with a housing code, *Camara* v. *Municipal Court of City*

*and County of San Francisco*, 387 U. S. 523, 535–538 (1967). But those exceptions do not apply where the officer's purpose is not to attend to the special needs or to the investigation for which the administrative inspection is justified. See *Whren*, *supra*, at 811–812. The Government seeks to justify the present arrest on the basis of a properly issued judicial warrant—so that the special-needs and administrative-inspection cases cannot be the basis for a purpose inquiry here.

Apart from those cases, we have almost uniformly rejected invitations to probe subjective intent. See *Brigham City* v. *Stuart*, 547 U. S. 398, 404 (2006). There is one category of exception, upon which the Court of Appeals principally relied. In *Edmond*, 531 U. S. 32, we held that the Fourth Amendment could not condone suspicionless vehicle checkpoints set up for the purpose of detecting illegal narcotics. Although we had previously approved vehicle checkpoints set up for the purpose of keeping off the road unlicensed drivers, *Delaware* v. *Prouse*, 440 U. S. 648, 663 (1979), or alcohol-impaired drivers, *Michigan Dept. of State Police* v. *Sitz*, 496 U. S. 444 (1990); and for the purpose of interdicting those who illegally cross the border, *United States* v. *Martinez-Fuerte*, 428 U. S. 543 (1976); we found the drug-detection purpose in *Edmond* invalidating because it was "ultimately indistinguishable from the general interest in crime control," 531 U. S*.,* at 44. In the Court of Appeals' view, *Edmond* established that "'programmatic purpose' is relevant to Fourth Amendment analysis of programs of seizures without probable cause." 580 F. 3d, at 968.

That was mistaken. It was not the absence of probable cause that triggered the invalidating-purpose inquiry in *Edmond*. To the contrary, *Edmond* explicitly said that it would approve checkpoint stops for "general crime control purposes" that were based upon merely "some quantum of individualized suspicion." 531 U. S., at 47. Purpose was

relevant in *Edmond* because "programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken *pursuant to a general scheme without individualized suspicion*," *id.,* at 45–46 (emphasis added).[1]

Needless to say, warrantless, "suspicionless intrusions pursuant to a general scheme," *id.*, at 47, are far removed from the facts of this case. A warrant issued by a neutral Magistrate Judge authorized al-Kidd's arrest. The affidavit accompanying the warrant application (as al-Kidd concedes) gave individualized reasons to believe that he was a material witness and that he would soon disappear. The existence of a judicial warrant based on individualized suspicion takes this case outside the domain of not only our special-needs and administrative-search cases, but of *Edmond* as well.

A warrant based on individualized suspicion[2] in fact grants more protection against the malevolent and the incompetent than existed in most of our cases eschewing inquiries into intent. In *Whren*, 517 U. S., at 813, and *Devenpeck*, 543 U. S., at 153, we declined to probe the motives behind seizures supported by probable cause but lacking a warrant approved by a detached magistrate.

_____

[1] The Court of Appeals also relied upon *Ferguson* v. *Charleston*, 532 U. S. 67 (2001), which held unconstitutional a program of mandatory drug testing of maternity patients. Like *Edmond*, that case involved a general scheme of searches without individualized suspicion. 532 U. S., at 77, n. 10.

[2] JUSTICE GINSBURG suggests that our use of the word "suspicion" is peculiar because that word "ordinarily" means "that the person suspected has engaged in wrongdoing." *Post*, at 3, n. 2 (opinion concurring in judgment). We disagree. No usage of the word is more common and idiomatic than a statement such as "I have a suspicion he knows something about the crime," or even "I have a suspicion she is throwing me a surprise birthday party." The many cases cited by JUSTICE GINSBURG, *post,* at 3, n. 2, which use the neutral word "suspicion" *in connection with* wrongdoing, prove nothing except that searches and seizures for reasons other than suspected wrongdoing are rare.

*Terry* v. *Ohio*, 392 U. S. 1, 21–22 (1968), and *Knights*, 534 U. S., at 121–122, applied an objective standard to warrantless searches justified by a lesser showing of reasonable suspicion. We review even some suspicionless searches for objective reasonableness. See *Bond*, 529 U. S., at 335–336, 338, n. 2. If concerns about improper motives and pretext do not justify subjective inquiries in those less protective contexts, we see no reason to adopt that inquiry here.

Al-Kidd would read our cases more narrowly. He asserts that *Whren* establishes that we ignore subjective intent only when there exists "probable cause to believe that a violation of law has occurred," 517 U. S*.,* at 811—which was not the case here. That is a distortion of *Whren*. Our unanimous opinion held that we would not look behind an objectively reasonable traffic stop to determine whether racial profiling or a desire to investigate other potential crimes was the real motive. See *id.,* at 810, 813. In the course of our analysis, we dismissed Whren's reliance on our inventory-search and administrative-inspection cases by explaining that those cases do not "endors[e] the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred," *id.,* at 811  But to say that ulterior motives do *not* invalidate a search that is legitimate because of probable cause to believe a crime has occurred is not to say that it *does* invalidate all searches that are legitimate for other reasons.

"[O]nly an undiscerning reader," *ibid.*, would think otherwise. We referred to probable cause to believe that a violation of law had occurred because that was the legitimating factor in the case at hand. But the analysis of our opinion swept broadly to reject inquiries into motive generally. See *id.,* at 812–815. We remarked that our special-needs and administrative-inspection cases are un-

usual in their concern for pretext, and do nothing more
than "explain that the exemption from the need for prob-
able cause (and warrant), which is accorded to searches
made for the purpose of inventory or administrative regu-
lation, is not accorded to searches that are *not* made for
those purposes," *id.,* at 811–812. And our opinion empha-
sized that we had at that time (prior to *Edmond*) rejected
every request to examine subjective intent outside the
narrow context of special needs and administrative inspec-
tions. See 517 U. S*.,* at 812. Thus, al-Kidd's approach
adds an "only" to a sentence plucked from the *Whren*
opinion, and then elevates that sentence (as so revised)
over the remainder of the opinion, and over the consistent
holdings of our other cases.

Because al-Kidd concedes that individualized suspicion
supported the issuance of the material-witness arrest
warrant; and does not assert that his arrest would have
been unconstitutional absent the alleged pretextual use of
the warrant; we find no Fourth Amendment violation.[3]
Efficient[4] and evenhanded application of the law demands

—————

[3] The concerns of JUSTICES GINSBURG and SOTOMAYOR about the valid-
ity of the warrant in this case are beside the point. See *post*, at 1–2
(GINSBURG, J., concurring in judgment); *post*, at 2 (SOTOMAYOR, J.,
concurring in judgment). The validity of the warrant is not *our* "open-
ing assumption," *post*, at 2 (GINSBURG, J., concurring in judgment); it is
the premise of al-Kidd's argument. Al-Kidd does not claim that
Ashcroft is liable because the FBI agents failed to obtain a valid war-
rant. He takes the validity of the warrant as a given, and argues that
his arrest nevertheless violated the Constitution because it was moti-
vated by an illegitimate purpose. His separate Fourth Amendment and
statutory claims against the FBI agents who sought the material-
witness warrant, which are the focus of both concurrences, are not
before us.

[4] We may note in passing that al-Kidd alleges that the Attorney Gen-
eral authorized the use of material-witness warrants for detention of
suspected terrorists, but not that he forbade the use of those warrants
to detain material witnesses. Which means that if al-Kidd's inquiry
into actual motive is accepted, mere determination that the Attorney

that we look to whether the arrest is objectively justified, rather than to the motive of the arresting officer.

### B

A Government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." *Anderson* v. *Creighton*, 483 U. S. 635, 640 (1987). We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. See *ibid.; Malley* v. *Briggs*, 475 U. S. 335, 341 (1986). The constitutional question in this case falls far short of that threshold.

At the time of al-Kidd's arrest, not a single judicial opinion had held that pretext could render an objectively reasonable arrest pursuant to a material-witness warrant unconstitutional. A district-court opinion had suggested, in a footnoted dictum devoid of supporting citation, that using such a warrant for preventive detention of suspects "is an illegitimate use of the statute"—implying (we accept for the sake of argument) that the detention would therefore be unconstitutional. *United States* v. *Awadallah*, 202 F. Supp. 2d 55, 77, n. 28 (SDNY 2002). The Court of Appeals thought nothing could "have given John Ashcroft fair[er] warning" that his conduct violated the Fourth Amendment, because the footnoted dictum *"call[ed] out Ashcroft by name"!* 580 F. 3d, at 972–973 (internal quotation marks omitted; emphasis added). We will indulge the assumption (though it does not seem to us realistic) that Justice Department lawyers bring to the Attorney Gen-

———————

General promulgated the alleged policy would not alone decide the case. Al-Kidd would also have to prove that the officials who sought his material-arrest warrant were motivated by Ashcroft's policy, not by a desire to call al-Kidd as a witness.

eral's personal attention all district judges' footnoted speculations that boldly "call him out by name." On that assumption, would it prove that for him (and for him only?) it became clearly established that pretextual use of the material-witness statute rendered the arrest unconstitutional? An extraordinary proposition. Even a district judge's *ipse dixit* of a holding is not "controlling authority" in any jurisdiction, much less in the entire United States; and his *ipse dixit* of a footnoted dictum falls far short of what is necessary absent controlling authority: a robust "consensus of cases of persuasive authority." *Wilson* v. *Layne*, 526 U. S. 603, 617 (1999).

The Court of Appeals' other cases "clearly establishing" the constitutional violation are, of course, those we rejected as irrelevant in our discussion of whether there was any constitutional violation at all. And the Court of Appeals' reference to those cases here makes the same error of assuming that purpose is only disregarded when there is probable cause to suspect a violation of law.

The Court of Appeals also found clearly established law lurking in the broad "history and purposes of the Fourth Amendment." 580 F. 3d, at 971. We have repeatedly told courts—and the Ninth Circuit in particular, see *Brosseau* v. *Haugen*, 543 U. S. 194, 198–199 (2004) *(per curiam)*— not to define clearly established law at a high level of generality. See also, *e.g., Wilson, supra*, at 615; *Anderson, supra*, at 639–640; cf. *Sawyer* v. *Smith*, 497 U. S. 227, 236 (1990). The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established. See *Saucier* v. *Katz*, 533 U. S. 194, 201–202 (2001); *Wilson, supra*, at 615.

The same is true of the Court of Appeals' broad historical assertions. The Fourth Amendment was a response to the English Crown's use of general warrants, which often

allowed royal officials to search and seize whatever and whomever they pleased while investigating crimes or affronts to the Crown. See *Stanford* v. *Texas*, 379 U. S. 476, 481–485 (1965). According to the Court of Appeals, Ashcroft should have seen that a pretextual warrant similarly "gut[s] the substantive protections of the Fourth Amendmen[t]" and allows the State "to arrest upon the executive's mere suspicion." 580 F. 3d, at 972.

Ashcroft must be forgiven for missing the parallel, which escapes us as well. The principal evil of the general warrant was addressed by the Fourth Amendment's particularity requirement, *Stanford*, *supra,* at 485, which Ashcroft's alleged policy made no effort to evade. The warrant authorizing al-Kidd's arrest named al-Kidd and only al-Kidd. It might be argued, perhaps, that when, in response to the English abuses, the Fourth Amendment said that warrants could only issue "on probable cause" it meant only probable cause to suspect a violation of law, and not probable cause to believe that the individual named in the warrant was a material witness. But that would make *all* arrests pursuant to material-witness warrants unconstitutional, whether pretextual or not— and that is not the position taken by al-Kidd in this case.

While featuring a District Court's footnoted dictum, the Court of Appeals made no mention of this Court's affirmation in *Edmond* of the "predominan[t]" rule that reasonableness is an objective inquiry, 531 U. S., at 47. Nor did it mention *Whren*'s and *Knights*' statements that subjective intent mattered in a very limited subset of our Fourth Amendment cases; or *Terry*'s objective evaluation of investigatory searches premised on reasonable suspicion rather than probable cause; or *Bond*'s objective evaluation of a suspicionless investigatory search. The Court of Appeals seems to have cherry-picked the aspects of our opinions that gave colorable support to the proposition that the unconstitutionality of the action here was clearly established.

Qualified immunity gives government officials breathing
room to make reasonable but mistaken judgments about
open legal questions. When properly applied, it protects
"all but the plainly incompetent or those who knowingly
violate the law." *Malley*, 475 U. S., at 341. Ashcroft de-
serves neither label, not least because eight Court of
Appeals judges agreed with his judgment in a case of first
impression. See *Wilson, supra,* at 618. He deserves quali-
fied immunity even assuming—contrafactually—that his
alleged detention policy violated the Fourth Amendment.

*       *       *

We hold that an objectively reasonable arrest and deten-
tion of a material witness pursuant to a validly obtained
warrant cannot be challenged as unconstitutional on the
basis of allegations that the arresting authority had an
improper motive. Because Ashcroft did not violate clearly
established law, we need not address the more difficult
question whether he enjoys absolute immunity. The
judgment of the Court of Appeals is reversed, and the case
is remanded for further proceedings consistent with this
opinion.

*It is so ordered.*

JUSTICE KAGAN took no part in the consideration or
decision of this case.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–98

_____

## JOHN D. ASHCROFT, PETITIONER *v.* ABDULLAH AL-KIDD

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[May 31, 2011]

JUSTICE KENNEDY, with whom JUSTICE GINSBURG, JUSTICE BREYER, and JUSTICE SOTOMAYOR join as to Part I, concurring.

I join the opinion of the Court in full. In holding that the Attorney General could be liable for damages based on an unprecedented constitutional rule, the Court of Appeals for the Ninth Circuit disregarded the purposes of the doctrine of qualified immunity. This concurring opinion makes two additional observations.

## I

The Court's holding is limited to the arguments presented by the parties and leaves unresolved whether the Government's use of the Material Witness Statute in this case was lawful. See *ante*, at 8 (noting that al-Kidd "does not assert that his arrest would have been unconstitutional absent the alleged pretextual use of the warrant"). Under the statute, a Magistrate Judge may issue a warrant to arrest someone as a material witness upon a showing by affidavit that "the testimony of a person is material in a criminal proceeding" and "that it may become impracticable to secure the presence of the person by subpoena." 18 U. S. C. §3144. The scope of the statute's lawful authorization is uncertain. For example, a law-abiding citizen might observe a crime during the days or weeks

before a scheduled flight abroad. It is unclear whether those facts alone might allow police to obtain a material witness warrant on the ground that it "may become impracticable" to secure the person's presence by subpoena. *Ibid.* The question becomes more difficult if one further assumes the traveler would be willing to testify if asked; and more difficult still if one supposes that authorities delay obtaining or executing the warrant until the traveler has arrived at the airport. These possibilities resemble the facts in this case. See *ante*, at 2.

In considering these issues, it is important to bear in mind that the Material Witness Statute might not provide for the issuance of warrants within the meaning of the Fourth Amendment's Warrant Clause. The typical arrest warrant is based on probable cause that the arrestee has committed a crime; but that is not the standard for the issuance of warrants under the Material Witness Statute. See *ante*, at 11 (reserving the possibility that probable cause for purposes of the Fourth Amendment's Warrant Clause means "only probable cause to suspect a violation of law"). If material witness warrants do not qualify as "Warrants" under the Fourth Amendment, then material witness arrests might still be governed by the Fourth Amendment's separate reasonableness requirement for seizures of the person. See *United States* v. *Watson*, 423 U. S. 411 (1976). Given the difficulty of these issues, the Court is correct to address only the legal theory put before it, without further exploring when material witness arrests might be consistent with statutory and constitutional requirements.

## II

The fact that the Attorney General holds a high office in the Government must inform what law is clearly established for the purposes of this case. *Mitchell* v. *Forsyth*, 472 U. S. 511, 525 (1985). Some federal officers perform

their functions in a single jurisdiction, say within the con-
fines of one State or one federal judicial district. They
"reasonably can anticipate when their conduct may give
rise to liability for damages" and so are expected to adjust
their behavior in accordance with local precedent. *Davis*
v. *Scherer*, 468 U. S. 183, 195 (1984); see also *Anderson* v.
*Creighton*, 483 U. S. 635, 639–640 (1987). In contrast the
Attorney General occupies a national office and so sets
policies implemented in many jurisdictions throughout the
country. The official with responsibilities in many juris-
dictions may face ambiguous and sometimes inconsistent
sources of decisional law. While it may be clear that one
Court of Appeals has approved a certain course of conduct,
other Courts of Appeals may have disapproved it, or at
least reserved the issue.

When faced with inconsistent legal rules in different
jurisdictions, national officeholders should be given some
deference for qualified immunity purposes, at least if they
implement policies consistent with the governing law of
the jurisdiction where the action is taken. As we have
explained, qualified immunity is lost when plaintiffs point
either to "cases of controlling authority in their jurisdic-
tion at the time of the incident" or to "a consensus of cases
of persuasive authority such that a reasonable officer
could not have believed that his actions were lawful."
*Wilson* v. *Layne*, 526 U. S. 603, 617 (1999); see also *ante*,
at 9–10. These standards ensure the officer has "fair and
clear warning" of what the Constitution requires. *United
States* v. *Lanier*, 520 U. S. 259, 271 (1997).

A national officeholder intent on retaining qualified
immunity need not abide by the most stringent standard
adopted anywhere in the United States. And the national
officeholder need not guess at when a relatively small set
of appellate precedents have established a binding legal
rule. If national officeholders were subject to personal
liability whenever they confronted disagreement among

appellate courts, those officers would be deterred from full use of their legal authority. The consequences of that deterrence must counsel caution by the Judicial Branch, particularly in the area of national security. See *Ashcroft* v. *Iqbal*, 556 U. S. ___, ___ (2009) (slip op., at 21). Furthermore, too expansive a view of "clearly established law" would risk giving local judicial determinations the effect of rules with *de facto* national significance, contrary to the normal process of ordered appellate review.

The proceedings in this case illustrate these concerns. The Court of Appeals for the Ninth Circuit appears to have reasoned that a Federal District Court sitting in New York had authority to establish a legal rule binding on the Attorney General and, therefore, on federal law-enforcement operations conducted nationwide. See 580 F. 3d 949, 972–973 (2009). Indeed, this case involves a material witness warrant issued in Boise, Idaho, and an arrest near Washington, D. C. Of course, district court decisions are not precedential to this extent. *Ante*, at 9–10. But nationwide security operations should not have to grind to a halt even when an appellate court finds those operations unconstitutional. The doctrine of qualified immunity does not so constrain national officeholders entrusted with urgent responsibilities.

# SUPREME COURT OF THE UNITED STATES

No. 10–98

## JOHN D. ASHCROFT, PETITIONER *v.* ABDULLAH AL-KIDD

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 31, 2011]

JUSTICE GINSBURG, with whom JUSTICE BREYER and JUSTICE SOTOMAYOR join, concurring in the judgment.

Is a former U. S. Attorney General subject to a suit for damages on a claim that he instructed subordinates to use the Material Witness Statute, 18 U. S. C. §3144, as a pretext to detain terrorist suspects preventively? Given *Whren* v. *United States*, 517 U. S. 806 (1996), I agree with the Court that no "clearly established law" renders Ashcroft answerable in damages for the abuse of authority al-Kidd charged. *Ante*, at 12. But I join JUSTICE SOTOMAYOR in objecting to the Court's disposition of al-Kidd's Fourth Amendment claim on the merits; as she observes, *post*, at 1 (opinion concurring in judgment), that claim involves novel and trying questions that will "have no effect on the outcome of th[is] case." *Pearson* v. *Callahan*, 555 U. S. 223, 236–237 (2009).

In addressing al-Kidd's Fourth Amendment claim against Ashcroft, the Court assumes at the outset the existence of a *validly obtained* material witness warrant. *Ante*, at 1, 12. That characterization is puzzling. See *post*, at 2 (opinion of SOTOMAYOR, J.).[1] Is a warrant "validly

_____

[1] Nowhere in al-Kidd's complaint is there any concession that the warrant gained by the FBI agents was validly obtained. But cf. *ante*, at 8, n. 3 (majority opinion).

obtained" when the affidavit on which it is based fails to inform the issuing Magistrate Judge that "the Government has no intention of using [al-Kidd as a witness] at [another's] trial," *post*, at 1, and does not disclose that al-Kidd had cooperated with FBI agents each of the several times they had asked to interview him, App. 26?

Casting further doubt on the assumption that the warrant was validly obtained, the Magistrate Judge was not told that al-Kidd's parents, wife, and children were all citizens and residents of the United States. In addition, the affidavit misrepresented that al-Kidd was about to take a one-way flight to Saudi Arabia, with a first-class ticket costing approximately $5,000; in fact, al-Kidd had a round-trip, coach-class ticket that cost $1,700.[2] Given these omissions and misrepresentations, there is strong cause to question the Court's opening assumption—a valid material-witness warrant—and equally strong reason to conclude that a merits determination was neither necessary nor proper.[3]

---

[2] Judicial officers asked to issue material witness warrants must determine whether the affidavit supporting the application shows that "the testimony of a person is material in a criminal proceeding" and that "it may become impracticable to secure the presence of the person by subpoena." 18 U. S. C. §3144. Even if these conditions are met, issuance of the warrant is discretionary. *Ibid.* ("judicial officer *may* order the arrest of the person" (emphasis added)). Al-Kidd's experience illustrates the importance of vigilant exercise of this checking role by the judicial officer to whom the warrant application is presented.

The affidavit used to secure al-Kidd's detention was spare; it did not state with particularity the information al-Kidd purportedly possessed, nor did it specify how al-Kidd's knowledge would be material to Sami Omar al-Hussayen's prosecution. As to impracticability, the affidavit contained only this unelaborated statement: "It is believed that if Al-Kidd travels to Saudi Arabia, the United States Government will be unable to secure his presence at trial via subpoena." App. 64. Had the Magistrate Judge insisted on more concrete showings of materiality and impracticability, al-Kidd might have been spared the entire ordeal.

[3] The Court thrice states that the material witness warrant for al-

———————

Kidd's arrest was "based on individualized suspicion." *Ante*, at 6, 8. The word "suspicion," however, ordinarily indicates that the person suspected has engaged in wrongdoing. See Black's Law Dictionary 1585 (9th ed. 2009) (defining "reasonable suspicion" to mean "[a] particularized and objective basis, supported by specific and articulable facts, for suspecting a person of criminal activity"). Material witness status does not "involv[e] suspicion, or lack of suspicion," of the individual so identified. See *Illinois* v. *Lidster*, 540 U. S. 419, 424–425 (2004).

This Court's decisions, until today, have uniformly used the term "individualized suspicion" to mean "individualized suspicion *of wrongdoing*." See *Indianapolis* v. *Edmond*, 531 U. S. 32, 37 (2000) (emphasis added); *Chandler* v. *Miller*, 520 U. S. 305, 313 (1997) (same). See also, *e.g.*, *Brigham City* v. *Stuart*, 547 U. S. 398, 405 (2006) (referring to "programmatic searches conducted without individualized suspicion— such as checkpoints to combat drunk driving or drug trafficking"); *Board of Ed. of Independent School Dist. No. 92 of Pottawatomie Cty.* v. *Earls*, 536 U. S. 822, 830 (2002) ("finding of individualized suspicion may not be necessary when a school conducts drug testing"); *Whren* v. *United States*, 517 U. S. 806, 817–818 (1996) (observed traffic violations give rise to individualized suspicion); *Michigan Dept. of State Police* v. *Sitz*, 496 U. S. 444, 451 (1990) ("Detention of particular motorists for more extensive field sobriety testing may require satisfaction of an individualized suspicion standard."); *Maryland* v. *Buie*, 494 U. S. 325, 334–335, n. 2 (1990) ("*Terry* [v. *Ohio*, 392 U. S. 1 (1968)] requires reasonable, individualized suspicion before a frisk for weapons can be conducted."); *Treasury Employees* v. *Von Raab*, 489 U. S. 656, 668 (1989) ("[I]n certain limited circumstances, the Government's need to discover . . . latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify [search that intrudes] on privacy . . . without any measure of individualized suspicion."); *O'Connor* v. *Ortega*, 480 U. S. 709, 726 (1987) ("petitioners had an 'individualized suspicion' of misconduct by Dr. Ortega"); *United States* v. *Montoya de Hernandez*, 473 U. S. 531, 538 (1985) ("Automotive travelers may be stopped at fixed checkpoints near the border without individualized suspicion . . ."); *New Jersey* v. *T. L. O.*, 469 U. S. 325, 342, n. 8 (1985) ("the search of T. L. O.'s purse was based upon an individualized suspicion that she had violated school rules"); *Michigan* v. *Summers*, 452 U. S. 692, 699, n. 9 (1981) ("police executing a search warrant at a tavern could not . . . frisk a patron unless the officers had individualized suspicion that the patron might be armed or dangerous").

The Court's suggestion that the term "individualized suspicion" is more commonly associated with "know[ing] something about [a] crime"

I also agree with JUSTICE KENNEDY that al-Kidd's treatment presents serious questions, unaddressed by the Court, concerning "the [legality of] the Government's use of the Material Witness Statute in this case." *Ante*, at 1 (concurring opinion). In addition to the questions JUSTICE KENNEDY poses, and even if the initial material witness classification had been proper, what even arguably legitimate basis could there be for the harsh custodial conditions to which al-Kidd was subjected: Ostensibly held only to secure his testimony, al-Kidd was confined in three different detention centers during his 16 days' incarceration, kept in high-security cells lit 24 hours a day, stripsearched and subjected to body-cavity inspections on more than one occasion, and handcuffed and shackled about his wrists, legs, and waist. App. 29–36; cf. *Bell* v. *Wolfish*, 441 U. S. 520, 539, n. 20 (1979) ("[L]oading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial and preserve the security of the institution. But it would be difficult to conceive of a situation where conditions so harsh, employed to achieve objectives that could be accomplished in so many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish.").

However circumscribed al-Kidd's *Bivens* claim against Ashcroft may have been, see *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971); *ante*, at 8 (majority opinion); *ante*, at 1 (KENNEDY, J., concurring), his remain-

————————

or "throwing . . . a surprise birthday party" than with criminal suspects, *ante*, at 6, n. 2 (internal quotation marks omitted), is hardly credible. The import of the term in legal argot is not genuinely debatable. When the evening news reports that a murder "suspect" is on the loose, the viewer is meant to be on the lookout for the perpetrator, not the witness. Ashcroft understood the term as lawyers commonly do: He spoke of detaining material witnesses as a means to "tak[e] *suspected terrorists* off the street." App. 41 (internal quotation marks omitted).

ing claims against the FBI agents who apprehended him invite consideration of the issues JUSTICE KENNEDY identified.[4]   His challenges to the brutal conditions of his confinement have been settled.  But his ordeal is a grim reminder of the need to install safeguards against disrespect for human dignity, constraints that will control officialdom even in perilous times.

––––––––––

[4] The District Court determined that al-Kidd's factual allegations against FBI agents regarding their "misrepresentations and omissions in the warrant application, if true, would negate the possibility of qualified immunity [for those agents]."  Memorandum Order in No. cv:05–093 (D Idaho, Sept. 27, 2006), p. 18.  The agents took no appeal from this threshold denial of their qualified immunity plea.

# SUPREME COURT OF THE UNITED STATES

－－－－－－

No. 10–98

－－－－－－

## JOHN D. ASHCROFT, PETITIONER *v.* ABDULLAH AL-KIDD

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 31, 2011]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG and JUSTICE BREYER join, concurring in the judgment.

I concur in the Court's judgment reversing the Court of Appeals because I agree with the majority's conclusion that Ashcroft did not violate clearly established law. I cannot join the majority's opinion, however, because it unnecessarily "resolve[s] [a] difficult and novel questio[n] of constitutional . . . interpretation that will 'have no effect on the outcome of the case.'" *Ante*, at 3 (quoting *Pearson* v. *Callahan*, 555 U. S. 223, 237 (2009)).

Whether the Fourth Amendment permits the pretextual use of a material witness warrant for preventive detention of an individual whom the Government has no intention of using at trial is, in my view, a closer question than the majority's opinion suggests. Although the majority is correct that a government official's subjective intent is generally "irrelevant in determining whether that officer's actions violate the Fourth Amendment," *Bond* v. *United States*, 529 U. S. 334, 338, n. 2 (2000), none of our prior cases recognizing that principle involved prolonged detention of an individual without probable cause to believe he had committed any criminal offense. We have never considered whether an official's subjective intent matters for purposes of the Fourth Amendment in that novel context, and we need not and should not resolve that question

in this case. All Members of the Court agree that, whatever the merits of the underlying Fourth Amendment question, Ashcroft did not violate clearly established law.

The majority's constitutional ruling is a narrow one premised on the existence of a "valid material-witness warran[t]," *ante*, at 1—a premise that, at the very least, is questionable in light of the allegations set forth in al-Kidd's complaint. Based on those allegations, it is not at all clear that it would have been "impracticable to secure [al-Kidd's] presence . . . by subpoena" or that his testimony could not "adequately be secured by deposition." 18 U. S. C. §3144; see First Amended Complaint in No. 05–093–EJL, ¶55, App. 26 ("Mr. al-Kidd would have complied with a subpoena had he been issued one or agreed to a deposition"). Nor is it clear that the affidavit supporting the warrant was sufficient; its failure to disclose that the Government had no intention of using al-Kidd as a witness at trial may very well have rendered the affidavit deliberately false and misleading. Cf. *Franks* v. *Delaware*, 438 U. S. 154, 155–156 (1978). The majority assumes away these factual difficulties, but in my view, they point to the artificiality of the way the Fourth Amendment question has been presented to this Court and provide further reason to avoid rendering an unnecessary holding on the constitutional question.

I also join Part I of JUSTICE KENNEDY's concurring opinion. As that opinion makes clear, this case does not present an occasion to address the proper scope of the material witness statute or its constitutionality as applied in this case. Indeed, nothing in the majority's opinion today should be read as placing this Court's imprimatur on the actions taken by the Government against al-Kidd. *Ante*, at 1 (KENNEDY, J., concurring) ("The Court's holding is limited to the arguments presented by the parties and leaves unresolved whether the Government's use of the Material Witness Statute in this case was lawful").