**Cameron BYRAM, Appellant**

v.

**The STATE of Texas**

**NO. PD–1480–15**

Court of Criminal Appeals of Texas.

DELIVERED: January 25, 2017

---

Steven W. Conder, Assistant District Attorney, Fort Worth, TX, Stacey Soule, Austin, TX, for State of Texas.

Richard A. Henderson, Attorney at Law, Fort Worth, TX, for Cameron Bryan.

## OPINION

Yeary, J., delivered the opinion for a unanimous Court.

Unlike singularly-focused federal law enforcement agencies, local police departments "have multiple responsibilities, only one of which is the enforcement of criminal law." Debra Livingston, *Police, Community Caretaking, and the Fourth Amendment*, 1998 U. CHI. LEGAL F. 261, 261. We expect them to aid individuals who are in danger of physical harm, protect the rights to speak and assemble, facilitate the movement of people and vehicles, assist people who cannot care for themselves, resolve conflict, and deter crime through their conspicuousness. *ABA Standards For Criminal Justice* §§ 1–1.1, 1–2.2 (1980). When law enforcement officers act in this community-caretaking role, they are not "engaged in the 'often competitive enterprise of ferreting out crime.'" *United States v. Rohrig*, 98 F.3d 1506, 1523 (6th Cir. 1996) (quoting *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948)).

But police officers do not always need to look for crime to find it. They may encounter crime while engaged in their community-caretaking functions, and when they do, we expect them to take the action necessary to "protect and serve." The officer in this case encountered and arrested an intoxicated driver during a traffic stop he initiated to check the welfare of a passenger in the vehicle. The question is whether this particular traffic stop was a reasonable seizure under the community-caretaking doctrine. We hold that it was.

## BACKGROUND

The Fort Worth Police Department assigned Officer Figueroa to monitor a bar district in downtown Fort Worth on the Fourth of July, 2013. At about 5:30 in the afternoon, he stopped at a red light with his windows rolled down. An SUV with its front passenger window rolled down pulled up to the light in the lane on his left, putting him within arm's reach of its open window. Figueroa smelled the odor of alcohol wafting from the SUV and noticed a woman "hunched over" in the passenger seat, motionless. Appellant, the SUV's driver, was staring straight forward, seemingly heedless of his passenger's apparent incapacity. Concerned that the passenger might be unconscious or in need of medical attention due to alcohol poisoning, Figueroa yelled at Appellant, asking if the passenger was okay. Appellant did not respond. Figueroa believed that Appellant must have heard him ask about the passenger because the traffic was idle and he had yelled the question. The light turned green and Appellant drove off, causing Figueroa to worry that Appellant was making an effort to "avoid contact with the police." Figueroa did not notice Appellant commit any traffic violations.

Figueroa pulled the SUV over, "made contact" with Appellant, and immediately

checked on the passenger. He discovered that she was "barely conscious" and "had some sort of medical problem." She had vomited "all over the passenger side" of the SUV. Figueroa immediately requested an ambulance. There were several hospitals within a five mile radius, and a second passenger in the SUV.[1]

Figueroa testified that when he turned on his lights to stop the SUV, he had no "real reason to think that the driver was intoxicated," and that he was "more concerned with the passenger" than investigating Appellant for driving while intoxicated. Ultimately, however, the passenger refused medical assistance, and Figueroa determined that Appellant was intoxicated and arrested him.[2] The State charged Appellant with driving while intoxicated with an open container in his possession. TEX. PENAL CODE § 49.04(a), (c).

Appellant challenged the traffic stop in a motion to suppress. After a hearing, the trial court denied the motion without written findings.[3] Appellant pled guilty, but he retained and exercised his right to appeal the trial court's ruling on the motion to suppress. On appeal, Appellant argued that the traffic stop was an unreasonable seizure in violation of the Fourth Amendment to the United States Constitution and Article I, Section 9 of the Texas Constitution.[4] The Second Court of Appeals reversed Appellant's conviction and re-

manded the case, holding that Appellant's detention was unreasonable and that the trial court abused its discretion in denying his motion to suppress. *Byram v. State,* 478 S.W.3d 905, 911 (Tex. App.–Fort Worth 2016). In reaching its conclusion that the traffic stop was unreasonable, the court of appeals first decided that the "community caretaking exception" did not apply. *Id.* at 909. It then determined that, prior to stopping the SUV, Figueroa lacked reasonable suspicion that Appellant was engaged in criminal activity, rendering the stop unreasonable. *Id.* at 911.

The State filed a petition for discretionary review, which we granted. The State argues, as it did in the courts below, that Figueroa was engaged in his community-caretaking function when he pulled over the SUV. Alternatively, the State asserts that Figueroa had reasonable suspicion that criminal activity was afoot before he initiated the traffic stop.

■ We hold that Figueroa was reasonably engaged in a community-caretaking function when he pulled over the SUV to check on Appellant's passenger. His initial seizure of the SUV and its occupants—including Appellant—was therefore reasonable. Figueroa thus did not need reasonable suspicion of criminal activity to stop Appellant, and we need not reach that issue.

1. The record does not reveal exactly when Figueroa became aware that the incapacitated female passenger was not alone in the SUV with Appellant. Figueroa testified that he "couldn't really see" if anyone was in the back seat when he first noticed the passenger hunched over. When asked "And did you not see the second passenger, the non-driver?" on cross examination, he responded "I was aware that she was there when I made contact with the driver."

2. The precise timing of these events in relation to each other is unclear from the record.

In any event, Appellant does not dispute the reasonableness of the stop's duration.

3. On a motion to suppress evidence, a trial court must state its findings of fact and conclusions of law upon the losing party's request. *State v. Cullen,* 195 S.W.3d 696, 699 (Tex. Crim. App. 2006). However, Appellant made no such request.

4. The motion to suppress included these claims, among others.

## STANDARD OF REVIEW

When, as in this case, the trial court has not issued written findings of fact, we assume that "the trial court implicitly resolved all issues of historical fact and witness credibility in the light most favorable to its ultimate ruling." *State v. Saenz*, 411 S.W.3d 488, 495 n.4 (Tex. Crim. App. 2013). We give "almost total deference" to those findings of fact and credibility determinations. *State v. Mazuca*, 375 S.W.3d 294, 307 (Tex. Crim. App. 2012). We then review *de novo* the trial court's application of the law to those facts to determine whether the trial court correctly assessed the legal significance of the facts it found. *Id.*

## COMMUNITY CARETAKING

Local police officers frequently engage in "community caretaking functions," totally divorced from the detection, investigation, and acquisition of evidence relating to the violation of a criminal statute. *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). "As part of his duty to 'serve and protect,' a police officer may stop and assist an individual whom a reasonable person—given the totality of the circumstances—would believe is in need of help." *Wright v. State*, 7 S.W.3d 148, 151 (Tex. Crim. App. 1999). However, because the reasonableness of a community-caretaking seizure sprouts from its dissociation from the competitive enterprise of ferreting out crime, "a police officer may not properly invoke his community caretaking function if he is primarily motivated by a non–community caretaking purpose." *Corbin v. State*, 85 S.W.3d 272, 276–277 (Tex. Crim. App. 2002). Determining whether an officer may properly invoke his community-caretaking function is thus "a two-step inquiry: (1) whether the officer was primarily motivated by a community-caretaking purpose; and (2) whether the officer's belief that the individual needed help was reasonable." *Gonzales v. State*, 369 S.W.3d 851, 854–55 (Tex. Crim. App. 2012). The standard for reasonableness is no different when the officer stops a vehicle to check the welfare of a passenger rather than the driver. *Wright*, 7 S.W.3d at 151.

The initial inquiry is subjective: What was Figueroa's primary motivation for the stop? This is a factual question that turns on the credibility and demeanor of Figueroa when he testified at the suppression hearing. *See Gonzales*, 369 S.W.3d at 855 (deferring to the trial court's determination of an officer's primary motivation for a community-caretaking stop when it was supported by the record because the issue "depends so much on credibility and demeanor"). Figueroa testified that he was "more concerned with the passenger" than investigating the driver for driving while intoxicated. In denying Appellant's motion to suppress, the trial court implicitly found this testimony to be true: Figueroa's primary motivation was to assist Appellant's passenger. We defer to this implied finding accordingly.[5] Because the record supports

---

5. It is unclear whether we must continue to inquire into the actual motivations of the police in community-caretaking cases in light of the United States Supreme Court's opinion in *Ashcroft v. al–Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). In *al-Kidd*, the Supreme Court held that a material witness warrant could be used as a pretext to detain the defendant for the purpose of investigating him as a terror suspect. *Id.* at 744, 131 S.Ct. 2074. In dismissing the defendant's argument that the actual motivation behind his detention should have a role in the Fourth Amendment analysis, the Court explained that "Fourth Amendment reasonableness is predominately an objective inquiry." Id. at 736, 131 S.Ct. 2074 (internal quotation marks omitted). The Court cited *Whren v. United States*, 517 U.S. 806, 814, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), for the proposition that

the conclusion that Figueroa's primary motivation was to assist a woman he thought might need help rather than to enforce criminal law, we proceed to the objective inquiry of whether his belief that she needed help was reasonable.

The reasonableness of Figueroa's belief that Appellant's passenger needed help is an application-of-law-to-fact question. We defer to the trial court's implied determination of the facts constituting the circumstances facing Figueroa prior to the traffic stop. Whether a reasonable person under those circumstances would believe that Appellant's passenger was in need of help is a legal question like reasonable suspicion or probable cause: We review it *de novo*. Cf. *State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008) (factual findings "do not include legal rulings on 'reasonable suspicion' or 'probable cause'; those are legal conclusions subject to *de novo* review, not deference").

■ In determining whether an officer's belief that an individual needs help is reasonable, we developed a non-exclusive list of relevant factors in *Wright*: (1) the nature and level of distress exhibited by the individual; (2) the location of the individual; (3) whether or not the individual was alone and/or had access to assistance independent of that offered by the officer; and (4) to what extent the individual—if not assisted—presented a danger to herself or others. 7 S.W.3d at 152. But reasonableness remains the ultimate standard. *Cady*, 413 U.S. at 439, 93 S.Ct. 2523. These "*Wright* factors" are merely considerations that may be useful for determining what is reasonable under the totality of the circumstances, and are not "the elements of reasonableness." *Gonzales*, 369 S.W.3d at 855.

■ The first *Wright* factor, the nature and level of distress exhibited by the individual, is entitled to the most weight, though it is not always dispositive. *Id.* "A particular level of exhibited distress may be seen as more or less serious depending on the presence or absence of the remaining three factors." *Id.* (quoting *Corbin*, 85 S.W.3d at 277). A stop under the *Cady* community-caretaking doctrine is distinct from a stop to render emergency aid, and the distress exhibited by the individual need not suggest harm dire enough to trigger the emergency aid doctrine. *Laney*

state actions justified by the objectively-viewed circumstances are "reasonable '*whatever* the subjective intent' motivating the relevant officials." 563 U.S. at 736, 131 S.Ct. 2074. According to the Court in *al-Kidd*, its analysis in *Whren* "swept broadly to reject inquiries into motive generally." *Id.* at 739, 131 S.Ct. 2074. *Al–Kidd* describes special-needs and administrative-search cases as two "limited exceptions" where "actual motivations do matter," noting that apart from special-needs and administrative-inspection cases, the Court has "almost uniformly rejected invitations to probe subjective intent." *Id.* at 737, 131 S.Ct. 2074.

Since *al-Kidd* was decided, we have continued to inquire into the officer's primary motivations in the community-caretaking context without addressing *al-Kidd*'s suggestion that *Whren* limited inquiries into the actual motivations of police to special-needs and administrative-search cases. *Gonzales*, 369 S.W.3d at 854–855. A case may arise where we must reconcile *al-Kidd* with our community-caretaking jurisprudence. But this is not that case. A footnote in the State's brief questions the need to conduct a subjective inquiry, citing *al-Kidd*, but the State ultimately does not argue that we should abdicate our foundational community-caretaking cases that prescribe the two-step approach. Furthermore, we reach the same result regardless of the subjective inquiry because the subjective inquiry here is resolved by deference to the trial court's implied finding supporting denial of Applicant's motion to suppress. Reconciling *al-Kidd* with our community-caretaking jurisprudence is thus unnecessary to the disposition of this case.

*v. State*, 117 S.W.3d 854, 861 (Tex. Crim. App. 2003).

Here, Figueroa observed Appellant's passenger hunched over and motionless, as the reek of alcohol wafted out of Appellant's SUV. Her location, the second *Wright* factor, further suggested she was in need of help. She was in the passenger seat of Appellant's SUV, which was stopped at a light in a bar district.[6] It was 5:30 p.m. on the Fourth of July, a day of prevalent intemperance in the bar district.[7] These facts further support the notion that Appellant's passenger was suffering from alcohol poisoning, and when combined with her motionless state, suggest that she was in need of assistance. There were several hospitals in the area, but the precariousness of her situation was exacerbated by the fact that—despite her apparent need for assistance—Appellant, the driver, appeared unconcerned.[8] Not only was Appellant failing to assist his passenger, but he also ignored Figueroa and drove away when Figueroa asked about the status of the passenger. This behavior suggests that, though the passenger was not alone in the car, she was not likely to receive assistance without Figueroa's intervention—the third *Wright* factor.

From Appellant's decision to ignore the police and drive away, a reasonable person might also infer that his passenger faced another danger: She was incapacitated and had no control over where Appellant was taking her. Whatever Appellant's true intentions, his decision to ignore the police and drive away could suggest to a reasonable observer that he was making an effort to evade law enforcement because he had a nefarious plan for his passenger—a plan that would be foiled by police intervention.[9] This consideration

6. The court of appeals' analysis of the second factor focused on the geographic location of the SUV, rather than the location of the passenger. *Byram*, 478 S.W.3d at 909. While that information is relevant, limiting the location discussion to the SUV's geographic location (on a busy street within five miles of several hospitals) and conducting no analysis outside of the *Wright* factors fails to assess reasonableness under the the totality of the circumstances, which is the proper scope of the reasonableness inquiry. *Wright*, 7 S.W.3d at 151. As we will explain, the circumstances Figueroa observed within the SUV are also relevant to whether a reasonable person would believe the passenger needed help.

7. "There's a lot of partying, for lack of better terms," explained Figueroa.

8. Admittedly, the fact that the driver appeared unconcerned with his passenger's incapacity could also support the inference that the cause of passenger's distress was under control. But when we test beliefs for reasonableness, we are not asking what other beliefs might also have been reasonable. *See Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997) (holding that the "as consistent with innocent activity as with criminal activity"

construct is not a viable test for determining reasonable suspicion). Indeed, when facts "cut both ways," it is possible that both beliefs are reasonable. As long as the officer's belief that an individual needs help is a belief that is reasonable under the totality of the circumstances, a seizure motivated by concern for that individual is reasonable. *Wright*, 7 S.W.3d at 151.

9. The fact that a state of distress may be caused by potential criminal activity does not remove it from consideration under the community-caretaking approach. When the police assist potential crime victims, "community caretaking cannot be disentangled from law enforcement." Livingston, *supra*, at 286. "When community caretaking interests predominate over law enforcement interests in such cases, however, the ordinary 'law enforcement' rules are still inadequate for assessing the propriety of police intrusions." *Id*. Accord *Corbin*, 85 S.W.3d at 282 (Keller, P.J., dissenting) ("the coexistence of investigatory and caretaking motives" should not remove a stop from the realm of community caretaking unless the stop is "mere subterfuge for an investigation"). We therefore do not require reasonable suspicion before considering potential victimization as a factor that aggra-

fits imperfectly into the *Wright* factors because it involves a different type of "distress" from that "exhibited by the individual" in need of help, but it is nevertheless relevant to whether—under the totality of the circumstances—a reasonable person would believe Appellant's passenger was in need of help.

■ The fourth *Wright* factor, the extent to which the individual is a danger to herself or others, should be afforded little weight when it is not applicable to the unique facts of a particular case. *Gonzales*, 369 S.W.3d at 856–857. Indeed, it does not seem to apply here. Appellant's passenger's situation appeared precarious because of alcohol she had apparently consumed and because of Appellant's behavior, not because of any particular activity she was engaged in when Figueroa noticed her. The fact that she was not actively endangering herself or others—or moving at all, for that matter—does not alleviate the distress she was exhibiting. Her distress was not a result of her capacity to cause danger, but rather her incapacity. We therefore afford this factor little weight.

Considering the totality of the circumstances surrounding Appellant's passenger at the time Figueroa initiated the traffic stop, a reasonable person would believe she was in need of help. Her incapacitated state, her location in the passenger seat of an unconcerned driver's vehicle in the middle of a bar district on the Fourth of July, and the driver's behavior comprised circumstances in which we would expect a caring police officer to intervene. Figueroa's decision to initiate a traffic stop was reasonable.

## CONCLUSION

Our communities depend on local police officers taking their community-caretaking duties seriously. Figueroa saw a woman in a precarious situation, and acted reasonably to help her by first asking whether she was okay, and then conducting a traffic stop when his question went unheeded. This is the sort of "sound, commonsense police work that reason commends, rather than condemns." *United States v. Prescott*, 599 F.2d 103, 106 (5th Cir. 1979). Because the traffic stop was a reasonable seizure, the trial court correctly overruled Appellant's motion to suppress. We reverse the judgment of the court of appeals and reinstate the judgment of the trial court.

vates the distress of the individual the officer      acts to help.