WILKINSON, Circuit Judge,
dissenting:
I cannot join the majority’s decision permitting a damages action to proceed against Transportation Security Administration (“TSA”) agents who were faithfully performing one of the most essential functions in our posN9/ll age: protecting air passengers from the threat of air terrorism. We now view these events in the comfort of hindsight. But while some may consider plaintiff Aaron Tobey’s conduct to be cute or even funny in retrospect, it was no laughing matter at the time.
According to the facts alleged in his complaint, Tobey engaged in what his own counsel and the district court both described as “bizarre” behavior in the security-screening area of Richmond International Airport, removing his shirt and pants despite being told that he did not need to disrobe. Tobey v. Napolitano, 808 F.Supp.2d 830, 850 (E.D.Va.2011). His “complaint makes no reference to any other passengers who stripped off their clothes — much less passengers who began stripping down and continued to do so even after being told by a [TSA agent] that it was unnecessary — or otherwise launched a protest inside the screening area.” Id. at 849.
Airport screening procedures should, of course, be open to debate and criticism. Had this protest been launched somewhere other than in the security-screening area, we would have a much different case. But Tobey’s antics diverted defendants from their passenger-screening duties for a period, a diversion that nefarious actors could have exploited to dangerous effect. Defendants responded as any passenger would hope they would, summoning local law enforcement to remove Tobey — and the distraction he was creating — from the scene.
For their reasonable efforts to allow the regular screening process to resume and to ensure passenger safety, defendants have been rewarded with the protracted burdens of a lawsuit and the prospect of significant damages liability. Given the way they have been treated, I would expect other TSA agents to refrain from responding to some unknown quantum of future security threats. And who could blame them?
The majority’s decision is not only unwise, but also profoundly unfair. Imagine having to make repeated prompt decisions — all while the lives of others just might hang in the balance. Now imagine being hauled into court and threatened with damages liability for those decisions, having never received sufficient notice as to the legal standards by which your conduct would be judged. Such is the deprivation of due process that the majority countenances today.
There is, of course, a familiar legal doctrine designed to avert the exactions of lawsuits like Tobey’s. For nearly forty years, the Supreme Court has consistently held that government officials performing discretionary functions enjoy qualified immunity from damages actions so long as *395 they do not violate “clearly established” law. See, e.g., Pearson v. Callahan, 555 U.S. 228, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); Saucier v. Katz, 538 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Court has, moreover, repeatedly averred that qualified immunity is an immunity not just from liability, but from suit, and that questions related to such immunity should accordingly be resolved earlier rather than later in the game. How sad that a message crafted so plainly at the headwaters of a hierarchical judicial system has failed to find its way downstream.
One would think the Supreme Court’s admonitions on the need for some modicum of specificity in notice to defendants might actually mean something. See, e.g., Ashcroft v. al-Kidd, — U.S. -, 131 S.Ct. 2074, 2083-84, 179 L.Ed.2d 1149 (2011); Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). And yet, by allowing Tobey’s suit to proceed by enunciating legal principles at the highest and most nebulous level of generality, the majority deprives the doctrine of its value. One would think that the uniquely sensitive nature of a security-screening area might have figured in the majority’s analysis. Yet it cites not one— not even one — case that would have afforded these agents anything resembling fair notice of what might be expected of them in the sensitive location and situation in which they found themselves. The majority says long after the fact what it believes these agents might have done, see ante at 393-94, but again it fails to reference even a single case from the Supreme Court, this court, or any other to support its view. If qualified immunity was not created to keep suits like this one from gathering steam, then I fail to see what utility the defense will have. I regret that a doctrine so essential to the performance of public functions has been reduced to hollow and formulaic recitations that signal only its demise.
I.
The most unsettling aspect of this decision is that of scapegoating low-level officials without ever apprising them of the legal standards governing their conduct. In denying the immunity, we are blindsiding others in a way we would never countenance for ourselves. Judges, after all, should appreciate the difficulty of judgment.
By affording officials the latitude to make reasonable judgments, qualified immunity helps to avert two evils. Subjecting officials to damages actions when the governing law is unclear would incur “substantial social costs,” as “fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.” Anderson, 483 U.S. at 638, 107 S.Ct. 3034. But qualified immunity is not premised on a utilitarian calculus alone; it also seeks to prevent “the injustice ... of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion.” Scheuer, 416 U.S. at 240, 94 S.Ct. 1683.
I do understand that, like the proverbial Roman tax collector, TSA screening agents are not natural objects of affection. It may seem a strange expenditure of energy strongly to defend them. Yet the most unpopular persons may not be treated unfairly under law, and that is especially the case when law itself has tasked them with the unpopular function that nonetheless is necessary to the achievement of a larger social good. The good of safe air travel seems too obvious to mention. The very last way to achieve that good is to penalize *396 without a crumb of notice those who make it possible.
A straightforward application of the elementary principles of qualified immunity leads inexorably to the conclusion that this complaint must be dismissed. For the legal standard identified by Tobey and the majority as governing this case could not possibly have provided adequate notice to defendants that their alleged actions were unlawful. According to that standard, because an airport is a nonpublic forum, any regulation restricting speech therein “need only be reasonable, as long as the regulation is not an effort to suppress the speaker’s activity due to disagreement with the speaker’s view.” Int’l Soc’y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 679, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). This standard encompasses two prongs — a reasonableness requirement and a ban on viewpoint discrimination— and though the majority repeatedly conflates them in its analysis, they impose distinct requirements. Considering each in turn, it becomes evident that no case law could possibly have put defendants on notice that they could not respond to To-bey’s conduct by defusing the situation as they did.
A.
Start with the requirement that restrictions on speech in a nonpublic forum be “reasonable.” The majority concedes that a general reasonableness requirement does not in itself create clearly established law sufficient to defeat a qualified-immunity defense. Ante at 392 (citing al-Kidd, 131 S.Ct. at 2084 (“The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.”)). This makes sense, of course, for how could an official possibly divine from a general command to “be reasonable” specific standards of conduct suited to the varied — and often unpredictable — circumstances he or she might face?
Because a general reasonableness requirement is so vague, Tobey and the majority must identify some case law that would have given defendants fair notice that it would be unreasonable to respond to his specific conduct by summoning local law enforcement. Yet they fail to do so, ignoring the Supreme Court’s admonition that courts must not “define clearly established law at a high level of generality,” al-Kidd, 131 S.Ct. at 2084, but rather must identify a constitutional right that was “ ‘clearly established’ in a more particularized, and hence more relevant, sense,” Anderson, 483 U.S. at 640, 107 S.Ct. 3034. To be sure, “officials can still be on notice that their conduct violates established law even in novel factual circumstances.” Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). But in the absence of some precedent addressing the scenario at issue, officials will have sufficient notice only when “ ‘a general constitutional rule already identified in the decisional law ... applies] with obvious clarity to the specific conduct in question.’” Id. at 741, 122 S.Ct. 2508 (emphases added) (quoting United States v. Lanier, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)). What the majority fails to appreciate is that qualified immunity requires “that in the light of preexisting law the unlawfulness must be apparent.” Anderson, 483 U.S. at 640, 107 S.Ct. 3034 (emphasis added).
General propositions stripped of all sense of context may seem useful to my fine appellate colleagues, see ante at 391— 92 n. 6, but they are of no use at all to people who must confront specific and difficult real-life situations. Neither Tobey nor the majority points to a single court *397 decision addressing a situation even remotely similar in time, place, or manner to the one that occurred here, let alone a decision that would have made the unlawfulness of defendants’ actions “apparent.” They cite no decision involving the period before scores of passengers board airplanes, no decision involving the security-screening area of an airport, and no decision involving distracting conduct that poses a potential security threat. Indeed, in the only appellate decision that even somewhat resembles this case, the court ruled for the government defendants, a ruling that would hardly have counseled defendants to have acted in a different fashion than they did. See Rendon v. TSA, 424 F.3d 475 (6th Cir.2005). The complete dearth of pertinent precedent should be dispositive of the question whether it was clearly established that defendants’ conduct was unreasonable: it was not.
Especially telling is the failure by Tobey and the majority to cite a single case involving conduct that disrupts security-screening activities, as Tobey’s conduct evidently did. The majority finds it significant that Tobey’s complaint nowhere explicitly alleges that his behavior caused any disruption but, on the contrary, asserts that he “remained quiet, composed, polite, cooperative, and complied with the requests of agents and officers.” Ante at 384. This statement, however, does not render defendants’ alleged actions unreasonable. First, it is belied by other allegations in the complaint. For example, as the district court noted, Tobey “alleges that he began stripping off his clothes inside the security screening area and continued to do so even after [one defendant] advised that removal of clothing was unnecessary.” Tobey, 808 F.Supp.2d at 850. Second, while it may be true that “[passengers routinely remove clothing at an airport screening station,” ante at 388, they do not routinely doff their undershirts and bare their chests; Tobey deliberately and indisputably removed much more clothing than is consistent with ordinary TSA screening practices. Needless to say, Tobey and the majority point to no decision holding that it is unreasonable to detain someone who fails to follow TSA instructions and proceeds in a manner calculated to divert attention from the normal screening process and redirect it toward himself.
In addition, whether or not Tobey caused a visible commotion in the screening area — whether or not he “took off his shirt, twirled it around his head, and ripped off his pants with a dramatic flourish, indeed causing a great spectacle,” ante at 388-89 — it is a simple matter of common sense that his behavior was disruptive. See Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (“Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.”). This inference follows ineluctably from the face of the complaint. Outside a few limited contexts, such as public swimming pools, removing one’s shirt and pants will always attract other people’s attention and distract them from whatever they happen to be doing. Tobey’s own counsel conceded as much when he described his client’s behavior as “bizarre,” an impression that the district court evidently shared. See Tobey, 808 F.Supp.2d at 850 (“Plaintiffs counsel conceded at oral argument that Plaintiffs behavior was bizarre, and that [defendants] were justified in summoning the [local p]olice for further inquiry.”). And Tobey himself anticipated the disruption his behavior might cause, alleging in his complaint that he purposefully “waited for the number of people in line to dimin *398 ish” in order to “avoid the possibility of causing delay for his fellow passengers.”
Of course, the majority offers no guidance whatsoever to TSA officials as to how many people must be waiting in line before they may take even modest preventive steps. And for good reason. Conduct like Tobey’s inevitably delays the screening process for other passengers, and referring a person who engages in it to local authorities prevents the screening line from jamming up and allows for a careful assessment of any threat the person might pose. See Rendon, 424 F.3d at 479. Such a referral was a perfectly reasonable step to take, as it provided an opportunity for further evaluation of the situation while avoiding any further potential disruptions to the screening process.
Disruptions in an airport security-screening area, especially ones involving “bizarre” behavior like public stripping, pose safety risks. As TSA regulations recognize, “[cjheckpoint disruptions potentially can be dangerous” for a number of reasons, including: a “disruptive individual may be attempting to discourage the screener from being as thorough as required”; a “screener may ... need to summon a checkpoint screening supervisor and law enforcement officer, taking them away from other duties”; and “[a] screen-er encountering such a situation must turn away from his or her normal duties to deal with the disruptive individual, which may affect the screening of other individuals.” 67 Fed.Reg. 8340, 8344 (Feb. 22, 2002). TSA regulations accordingly provide that “[n]o person may interfere with ... screening personnel in the performance of their screening duties.” 49 C.F.R. § 1540.109 (2012). Passenger safety would seem to require that TSA agents be able to focus on their screening tasks, unimpeded by boarding passengers attempting to divert their attention, whether as a means of protest or for more sinister purposes.
To deem defendants’ response to To-bey’s distracting behavior not only unreasonable, but clearly so, is to posit a world in which TSA agents can afford to indulge individuals’ flamboyant propensities in one of the most sensitive areas of the airport. After recent plots involving commercial aircraft, it should go without saying that this is not the world in which we live.
Tobey may very well have had benign motives. He may very well have posed no immediate security threat himself. But it will hardly do to countenance lengthy discovery in an attempt to discern what TSA agents could not possibly have known at the time. They had minutes to figure out what will take us months. They were not allowed simply to assume nonchalantly that Tobey’s actions were a harmless prank. They could not possibly have known how far he would go in disrobing or what further actions he was prepared to take. They could not close their eyes to the obvious risks that his distracting behavior created for his fellow passengers’ safety. Although no serious harm was done this time, “the Government need not wait until havoc is wreaked to restrict access to a nonpublic forum.” Cornelius v. NAACP, 473 U.S. 788, 810, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). In the absence of a single precedent instructing government officials to permit publicity stunts in highly sensitive venues like airport security-screening areas, I fail to see how defendants’ response was unreasonable, let alone how any unreasonableness was “clearly established.”
B.
As for the prohibition against viewpoint discrimination in a nonpublic forum, To-bey’s complaint alleges no violation of this prohibition at all — let alone one that was *399 “clearly established.” To be sure, he advances a conclusory legal allegation to that effect. Not once in his complaint, however, does Tobey plead a fact that would even suggest that defendants reacted to the viewpoint he expressed rather than to his state of undress.
Tobey does not suggest that defendants spoke even one word of disagreement with his message before summoning local police. He does not plead that they tolerated nonexpressive disruption in the screening area. And most tellingly of all, as the district court noted, his “complaint makes no reference to any other passengers who stripped off their clothes — -much less passengers who began stripping down and continued to do so even after being told by a [TSA agent] that it was unnecessary — or otherwise launched a protest inside the screening area” but who were not removed. Tobey, 808 F.Supp.2d at 849.
Had defendants truly committed viewpoint discrimination, one would think that Tobey could point to at least one comment or one comparator, someone who engaged in similarly distracting conduct but who expressed a viewpoint different from his (or no viewpoint at all) and whom defendants permitted to remain in the screening area. He does point to pictorial displays of people in bathing suits and athletic shorts that were posted in other areas of the airport, but his attempt to analogize his personal behavior to pictorial displays elsewhere is singularly unpersuasive. To-bey obviously experienced the events giving rise to this suit firsthand. He had every incentive to include every detail that could possibly help his case in his complaint. That he failed to plead a single telltale sign of viewpoint bias betrays just how baseless his claim really is.
What Tobey’s complaint does plead is not viewpoint discrimination, but a perfectly reasonable response by defendants to his highly unusual and potentially dangerous stunt. How can it possibly be viewpoint bias to refer someone in a state of unauthorized public undress for further evaluation and allow the routine screening process at an airport to resume? The agents here went the extra mile. Before ever summoning local law enforcement, one defendant “informed [Tobey] that removal of clothing was not necessary.” It is an irony to say the least that the defendants whose “intrusive” conduct Tobey was protesting were simultaneously advising him that intrusive screening measures were “not necessary.” In case there were any doubt, this statement confirms that defendants were concerned not with To-bey’s viewpoint, but with the fact that he was standing nearly naked in the worst possible place. It is sheer fancy to think that defendants had anything on their minds other than eliminating the distraction that Tobey’s state of dishabille was causing.
But even if defendants engaged in viewpoint discrimination, as Tobey improbably alleges, it was not clearly established that such discrimination was unconstitutional in the very limited setting of this' case. The majority notes that it is clearly established that “citizens have a right to voice dissent from government policies,” ante at 391 (citing Mills v. Alabama, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966)); that even in a nonpublic forum, “government officials] cannot ‘suppress expression merely because [they] oppose the speaker’s view,’ ” ante at 391 (quoting United States v. Kokinda, 497 U.S. 720, 721, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990)); and that “ ‘a public official may not misuse his power to retaliate against an individual for the exercise of a valid constitutional right,’ ” ante at 391 (quoting Trulock v. Freeh, 275 F.3d 391, 406 (4th Cir.2001)). While these abstract proposi *400 tions are as incontestable judicially as mom and apple pie, they fail to provide the kind of concrete guidance that could have rendered defendants’ alleged constitutional violation “clearly established.”
Of course the First Amendment subjects viewpoint discrimination to strict scrutiny — as well it should. But the government has a “compelling interest” in ensuring the safety of its citizens. That interest is not abrogated when they take to the air. A “narrowly tailored” means of achieving that interest, moreover, will on rare occasions involve taking into account the views expressed by individuals. As Justice Ginsburg recently explained, because law-enforcement officers performing a “protective function” will “rightly take into account words spoken to, or in the proximity of, the person whose safety is their charge,” “retaliatory animus cannot be inferred from the assessment they ma[k]e” of those words so long as the assessment is “rational.” Reichle v. Howards, - U.S. -, 132 S.Ct. 2088, 2097-98, 182 L.Ed.2d 985 (2012) (Ginsburg, J„ concurring in the judgment). Consider someone who shouts in the security-screening area, “All citizens have a constitutional right to carry guns on airplanes.” No one denies that TSA agents could weigh the speaker’s viewpoint without violating the First Amendment; indeed, we would regard any TSA agent who failed to do so as dangerously incompetent. And when agents confront a passenger like To-bey, who so dramatically expressed opposition to security-screening precautions right before boarding a flight, they confront a situation that only a naif would ignore. The passenger may turn out to be harmless, but the Constitution cannot possibly be construed to require TSA agents to take that gamble.
In addition, Tobey must prove that defendants’ alleged viewpoint discrimination caused his seizure. See Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir.2000). Tobey’s complaint, however, alleged a violation of the Fourth Amendment as well as the First, and for many of the reasons noted above, the district court rightly dismissed Tobey’s Fourth Amendment claim, describing defendants’ decision to summon local law enforcement as “eminently reasonable.” Tobey, 808 F.Supp.2d at 850. This conclusion should have led it to dispose of Tobey’s First Amendment claim as well. For just last Term, the Supreme Court held that, notwithstanding the First Amendment’s general prohibition against retaliatory arrests, “the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause” is not clearly established for purposes of qualified immunity, reasoning that any inference of impermissible causation is severely undermined by the existence of probable cause. Reichle, 132 S.Ct. at 2094 (majority opinion).
The same conclusion applies here: the causation element of Tobey’s First Amendment claim is undermined, if not vitiated, by the fact that defendants’ actions were reasonable under the Fourth Amendment. In light of Reichle, then, it was not clearly established that these same actions violated the First Amendment.
The majority responds by pointing to Tobey’s allegation that defendants’ actions were not supported by “probable cause.” See ante at 392. The problem with this argument is that neither Tobey nor the majority cites a single case holding that probable cause is the relevant standard governing the decision by an official who does not have arresting authority, such as a TSA agent, to refer someone to another official who does. And any confusion regarding the appropriate Fourth Amendment standard only bolsters the conclusion *401 that defendants’ alleged constitutional violation was not clearly established. For the majority to hold otherwise, it must ignore conflicting precedents and expect lay TSA agents to have imposed on the spot a degree of coherence on First and Fourth Amendment jurisprudence that has eluded serious students of constitutional law. Qualified immunity exists to forestall precisely this result.
C.
Unable to muster a single case so much as suggesting that defendants’ conduct was either (1) unreasonable or (2) impermissibly based on viewpoint, the majority instead attempts to find clearly established law in abstract principles snatched from disparate areas of First Amendment doctrine. First, the majority appears to embrace Tobey’s pronouncement that “individuals possess First Amendment rights at airports.” See ante at 391 (citing Bd. of Airport Comm’rs v. Jews for Jesus, 482 U.S. 569, 576, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987)). Of course they do. But that lofty proposition is not at issue in this case. The question, rather, is how these rights apply in the special context of security screening. By woodenly invoking any First Amendment precedent that happens to involve an airport, Tobey and the majority ignore the fact that this case concerns not the airport in general, but the security-screening area in particular, as well as the pressing security concerns that are uniquely relevant there. The Supreme Court’s airport cases simply do not speak to this special context and thus could not have given defendants notice that their response to Tobey’s conduct may have been unconstitutional.
Second, the majority cites Spence v. Washington, 418 U.S. 405, 410, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (per curiam), for the proposition that “the First Amendment protects bizarre behavior.” Ante at 388. That is not what Spence said. Rather, Spence held that what might otherwise seem like “bizarre behavior” may in fact be protected symbolic speech where “[a]n intent to convey a particularized message was present, and [where] in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it.” Spence, 418 U.S. at 410-11, 94 S.Ct. 2727. Even when these conditions are met, however, the government may, consistent with the First Amendment, reasonably respond to any “separately identifiable conduct” in which the speaker engages. Cohen v. California, 403 U.S. 15, 18, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). That was the case here. To-bey did not simply wear a t-shirt bearing his message, but rather engaged in the “separately identifiable conduct” of removing his shirt and pants. As noted earlier, Tobey’s own complaint makes clear that it was this conduct that provoked defendants’ response. Moreover, Spence had absolutely nothing to do with airport security screening. It concerned the display, from an apartment window, of an American flag with an appended peace .symbol, and to claim it provided specific guidance in the wholly different context here is an acrobatic leap that my friends in the majority should have the prudence to resist.
D.
The majority attempts to mitigate the injustice of its qualified-immunity ruling by noting that defendants still might receive such immunity at the summary-judgment stage. See ante at 393-94. Small consolation that. The multiple admonitions that fall on deaf ears today hardly assure a receptive audience tomorrow. Among those admonitions are the Supreme Court’s repeated instructions that qualified *402 immunity is an immunity from suit, not just damages, and that it must therefore be recognized before the considerable costs of litigation accumulate. See, e.g., Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam); Siegert v. Gilley, 500 U.S. 226, 233, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); Mitchell v. Forsyth, 472 U.S. 511, 526-27, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Whatever the eventual outcome of this suit might be, defendants are left to suffer the immediate consequences, the very consequences that any immunity, to be effective, is designed to alleviate.
II.
Tobey’s suit fails for another, independent reason, and in rejecting this reason, the majority manages to flout a second body of Supreme Court precedent. In a recent line of decisions, the Court has held that a plaintiff must allege enough factual content in his complaint to render his legal claim for relief “plausible on its face” in order to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Iqbal, 556 U.S. at 678, 129 S.Ct. 1937; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Tobey’s complaint falls well short of this requirement, for it conclusorily asserts that defendants engaged in viewpoint discrimination without pleading so much as a single factual allegation that supports this conclusion. In short, by announcing a near-categorical rule that every complaint survives a motion to dismiss, the majority proceeds as if Twombly and Iqbal were purely advisory.
The rules of pleading assume particular importance in the context of a damages action against a public official, especially one alleging that the official acted with an impermissible motive. As the Supreme Court explained even before Iqbal, “[b]e-cause an official’s state of mind is easy to allege and hard to disprove,” a court confronting such an allegation “must exercise its discretion in a way that protects the substance of the qualified immunity defense ... so that officials are not subjected to unnecessary and burdensome discovery or trial proceedings.” Crawford-El v. Britton, 523 U.S. 574, 584-85, 597-98, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (internal quotation marks omitted). This Court has similarly observed that “the protection afforded officials by an objective test [for qualified immunity] would be illusory if the simple allegation of discriminatory animus sufficed to set it aside.” Gooden v. Howard Cnty., Md., 954 F.2d 960, 969 (4th Cir.1992) (en banc). The doctrine of qualified immunity and the rules of pleading are therefore mutually reinforcing: the former ensures that officials cannot be subjected to damages suits for making close judgment calls where the governing law was unclear, while the latter ensure that this defense cannot be defeated by a bare allegation of impermissible motive.
In light of these principles, it becomes clear that Tobey’s complaint fails to allege a “plausible” claim of viewpoint discrimination against defendants. This inquiry is governed by what should by now be a familiar two-step analysis. First, a court should “begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth” ordinarily accorded the allegations in a complaint at the motion-to-dismiss stage. Iqbal, 556 U.S. at 679, 129 S.Ct. 1937. Mere “ ‘labels and conclusions’ ” or “ ‘a formulaic recitation of the elements of a cause of action will not do.’ ” Id. at 678, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955). Nor will “ ‘naked assertion^]’ devoid of ‘further factual enhancement.’ ” Id. (quoting Twombly, 550 U.S. at 557, 127 S.Ct. 1955). *403 Second, setting aside any unsupported legal conclusions, a court “should assume the[] veracity” of any remaining “well-pleaded factual allegations” and “determine whether they plausibly give rise to an entitlement to relief.” Id. at 679, 129 S.Ct. 1937. “Where a complaint pleads facts that are ‘merely consistent with’ a defendant’s liability, it ‘stops short of the line between possibility and plausibility of entitlement to relief.’ ” Id. at 678, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 557, 127 S.Ct. 1955). Thus, a plaintiff fails to adequately plead his claim that a defendant acted unlawfully if there exists an “ ‘obvious alternative explanation’ ” for the defendant’s conduct that renders the unlawful explanation implausible. Id. at 682, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 567, 127 S.Ct. 1955).
The only reference to viewpoint discrimination in Tobey’s entire complaint constitutes a “naked assertion,” not a “well-pleaded factual allegation.” Tobey asserts that defendants “seized [him], or in collaboration with others caused his seizure, without probable cause because of the message conveyed by Plaintiffs silent, nonviolent expression of objection to the TSA’s screening policies ... and thereby engaged in content and/or viewpoint discrimination.” This allegation amounts to nothing more than a “formulaic recitation of the elements” of a First Amendment retaliation claim. To make out such a claim, a plaintiff must show (1) “that his or her speech was protected,” (2) “that the defendant’s alleged retaliatory action adversely affected the plaintiffs constitutionally protected speech,” and (3) “that a causal relationship exists between [the plaintiffs] speech and the defendant’s retaliatory action.” McGraw, 202 F.3d at 686. Tobey asserts that defendants acted “because of’ his speech and thus engaged in “viewpoint discrimination,” but these phrases do no more than reiterate the third element of a retaliation claim; they in no way make it more plausible that the element is satisfied in this case.
Indeed, Tobey’s allegation of viewpoint discrimination is barely distinguishable from the allegation of religious and racial discrimination that the Supreme Court rejected as conclusory in Iqbal. According to Iqbal’s allegation, the defendants in that case “ ‘knew of, condoned, and willfully and maliciously agreed to subject [him]’ to harsh conditions of confinement ‘as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest.’ ” Iqbal, 556 U.S. at 680, 129 S.Ct. 1937. Substitute “message” for “religion, race, and/or national origin” and “because of’ for “solely on account of’ and you basically have Tobey’s allegation of viewpoint discrimination. If Iqbal’s allegation could not pass as a well-pleaded fact, then Tobey’s cannot fare any better.
Stripped of the conclusory allegation of viewpoint discrimination, Tobey’s First Amendment claim “stops well short of the line between possible and plausible.” Only two factual allegations in Tobey’s 128-paragraph complaint concern the actions of defendants at issue here. Specifically, Tobey alleges, first, that, after he removed his shirt and pants, one defendant “informed [him] that removal of clothing was not necessary,” and, second, that the same defendant “radioed for assistance” when Tobey remained unclothed and stated his opposition to TSA screening procedures, while another “direct[ed] [him] to stay where he was” pending the arrival of local law enforcement. These allegations do not render Tobey’s claim of viewpoint discrimination remotely plausible. On the contrary, there is an “obvious alternative explanation” for defendants’ alleged actions — namely, that they summoned local law enforcement because of *404 Tobey’s nearly naked state. Iqbal, 556 U.S. at 682, 129 S.Ct. 1937. Although it suggests otherwise, see ante at 387 n. 2, it is the majority that fails to recognize that the TSA agents took action only after To-bey gratuitously stripped his clothing and emerged in the security-screening area in a state of undress. Tobey’s own complaint thus not only fails to negate the obvious alternative explanation for defendants’ conduct; it positively reinforces it. His allegation that one defendant “informed [him] that removal of clothing was not necessary” evinces a focus on his undress rather than his speech. Moreover, the complaint describes a course of conduct on the part of defendants that was not only perfectly reasonable in its own right, but also perfectly consistent with the First Amendment. It is unusual to have a complaint whose allegations work so actively to make defendants’ case, but so it is with Tobey’s.
The majority’s approach to this case misses the entire point of Twombly and Iqbal. American jurisprudence has long been founded on the presumption of innocence. That makes especial sense in the context of criminal justice, when the state bears the burden not only of proving guilt, but of doing so beyond a reasonable doubt. Twombly and Iqbal make clear, however, that the presumption of innocence retains some meaning even in the different context of a civil action. That is to say, a legal system is not justified in presuming culpability based on the mere “possibility” of the same if there exists a perfectly “obvious” and innocent explanation for a defendant’s actions. Here, the explanation of innocence is not only obvious but likely, given the potential security threat posed by Tobey’s conduct. To reject Twombly and Iqbal in circumstances such as these is to accord no significance at all to the signal contribution of those cases, which presumes that Americans, even those in government, act within the strictures of the law and allocates the burden of plausibly showing otherwise to those who charge unlawful conduct.
III.
Whatever the ultimate fate of Tobey’s lawsuit,* it is hard to overlook the injustice done these defendants, who have been deprived of the most straightforward application of qualified-immunity doctrines and Twombly/Iqbal pleading standards. Faithfully applying these doctrines would not lead us to constrict the First Amendment values that Tobey and the majority claim to champion. Consider all the other venues in which Tobey could have protested TSA screening policies. Indeed, many airports have permitted such protests in less sensitive locations. See, e.g., Lee Bergquist, Airport Body Scan Protests Fizzle Out, Milwaukee J. Sentinel, Nov. 24, 2010, http://www.jsonline.com/news/ milwaukee/110365459.html. Had Tobey mounted his protest somewhere other than the security-screening area, we would have confronted a very different question. I am sure the particular strategy employed by Tobey helped to attract greater attention to his message. But it is always true that the more disruptive the speaker, the more attention the message garners. And if that becomes the abiding principle of decision, then the law of reasonable time, place, and manner restrictions will be soon set at naught. Just as one may not shout “Fire!” falsely in a crowded theater, so one may not theatrically divert TSA agents in *405 their screening tasks, even in order to express disapproval of their actions.
No one enjoys having to endure the inconvenience of airport security screening. No one wants to toss his or her shoes and other personal effects into a bin. TSA agents, moreover, can and do make mistakes, and there is always the chance that imbuing subordinate officials with a bit of authority can make them tyrants in their spheres. Whether TSA screening procedures are too intrusive and demeaning is surely a debate worth having, and Tobey may well have something of value to contribute to it. But TSA agents also perform what is indubitably a vital function, and it is sometimes necessary to make small sacrifices to achieve greater gains or, as in this case, to avoid catastrophic loss.
Wherever the grand balance may be struck, the particulars here leave little room for doubt. These agents were not out to squelch speech or to handle passengers rudely. They advised less intrusive measures, not more. The provocation was then thrust upon them, and they gave to passenger protection the benefit of the doubt. They have now been entangled in a lawsuit without so much as a pass at proper notice. They face further litigation for doing nothing more than seeking to ensure our safety in the skies.
They deserve better. I respectfully dissent.

 Whether the cause of action asserted by Tobey would lie under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), is not before us, and I do not address it.