Wood, Chief Judge, dissenting.
The question in this case is whether the police are entitled to enter, search, and seize an object from a person's home (including its curtilage) when they do not have a warrant, they do not have probable cause to believe that a crime is being committed, and none of the exceptions to the warrant requirement such as exigent circumstances is present. The majority concludes that the answer is "yes." It does so by diluting the probable-cause requirement for searches of a home down to the "reasonable-suspicion" level described in Terry v. Ohio , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), even though nothing in Terry or any other decision of the Supreme Court justifies this step. I respectfully dissent.
I
While the majority's description of the facts is mostly accurate-minus a potentially important detail I discuss below-I restate them here in order to stress some additional relevant circumstances. Around 11:40 p.m. on the night of October 11, 2016, Antoine Richmond was walking toward his home. Two Milwaukee police officers-Anthony Milone and Chad Boyack-spotted Richmond about 70 feet away from their marked squad car. They noticed that his hand was tucked in the kangaroo pouch of his shirt, which was bulging out. Boyack said that he had a hunch that the bulge was caused by a gun.
So far, there was nothing that would support a finding that Richmond was doing anything wrong. Like many states in the post-Heller world, Wisconsin permits both "concealed carry" and "open carry" of a firearm. See Wis. Stat. § 175.60 (concealed); Wis. Stat. § 947.01 (person not guilty of disorderly conduct for "going armed with a firearm" regardless whether it "is concealed or openly carried"). True, the neighborhood in which Richmond was walking was known to be a high-crime area, but that simply underscores why a person might, for self-defense, want to have a gun with him. The act of walking down the street with a visible gun or a possible gun under some clothing thus does not, without more, give rise even to a reasonable suspicion that the person is violating the law, much less probable cause. And at this stage of the story, there was nothing more. Richmond had not seen them, nor was he doing anything that *420 could be characterized as flight or unexplained concealment.
With their curiosity piqued by the bulge, the officers made a U-turn and approached Richmond; at that point they briefly made eye contact with him. Richmond then "picked up his pace, left the sidewalk, and crossed the grass in front of a duplex at 1933/35 West Vienna Avenue." United States v. Richmond , No. 16-cr-197-pp, at 3 (E.D. Wis. May 18, 2018). This was still not enough to raise even a reasonable suspicion that Richmond was committing even a minor crime. He was not running away from the squad car, cf. Illinois v. Wardlow , 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), and no one has pointed to any Milwaukee or Wisconsin rule requiring people to walk only on the sidewalk. Moreover, as I explain in more detail below, the majority's statement that Richmond "changed direction" upon seeing the officers goes beyond the findings of either the magistrate judge or the district judge; it is at best the government's version of the events.
As the officers parked their squad car and got out, Richmond walked up the steps to the porch, opened the screen door, and put a dark object on the door-frame between the screen door and the principal front door, which was closed. The officers could not identify the object that Richmond had put down, even though they suspected that it might be a gun. Richmond closed the screen door and headed down the stairs toward the officers. Officer Milone walked around him toward the door, while Officer Boyack identified the two as Milwaukee police. Milone then opened the screen door, saw a black, semi-automatic handgun, and seized it. Boyack asked Richmond if he was a felon, and Richmond admitted that he was. The officers promptly arrested Richmond and placed him into custody. Ultimately, he was convicted on a federal charge of illegal possession of a gun as an ex-felon, 18 U.S.C. § 922(g), upon a conditional plea of guilty. Everyone agrees that the only issue in the case is whether Richmond's motion to suppress the gun should have been granted.
II
There are only two ways in which one might seek to justify the officers' act of opening the screen door and seizing the gun: first, Richmond might have consented to their entry; or second, the police might have had the right to enter without consent, either because they had a warrant, or because one of the exceptions to the warrant requirement applies. No one argues that Richmond consented to Milone's act of opening his screen door. I accept, however, and Richmond concedes, that the conversation that took place on the porch before Milone opened the door was consensual.
That takes me directly to the Fourth Amendment analysis of the officers' actions. I first explain why they violated the rule of Florida v. Jardines , 569 U.S. 1, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013), and I then discuss why the Terry rule cannot save this search and seizure.
A
In Jardines , the Supreme Court considered the question "whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a 'search' within the meaning of the Fourth Amendment." Id. at 3, 133 S.Ct. 1409. There, the police officer had allowed the dog to go up to the base of the front door of the house; the dog alerted to the presence of drugs (in that case, marijuana); and the detective then obtained a warrant to search the house based on the dog's alert.
*421 The Court began its analysis by emphasizing that the Fourth Amendment has always protected against physical intrusions of the home. Id. at 5, 133 S.Ct. 1409. It then summarized its holding as follows:
That principle renders this case a straightforward one. The officers were gathering information in an area belonging to Jardines and immediately surrounding his house-in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.
Id. at 5-6, 133 S.Ct. 1409. The home, the Court continued, "is first among equals" for purposes of the Fourth Amendment. Id. at 6, 133 S.Ct. 1409. And that does not mean only the physical structure of the building. The Court went out of its way to reaffirm that the curtilage-that is, "the area immediately surrounding and associated with the home"-is also part of the home itself under the Fourth Amendment. Id. (cleaned up). The front porch, it concluded, is "the classic exemplar" of a space that falls within the curtilage. Id. at 7, 133 S.Ct. 1409.
The Court then rejected the possibility that the dog's presence on the porch fell within the license that the home's occupants are presumed to grant for "solicitors, hawkers, and peddlers of all kinds," id. at 8, 133 S.Ct. 1409, with this comment:
[I]ntroducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do that.
Id. at 9, 133 S.Ct. 1409. If an officer's actions fall outside the scope of the license that a reasonable officer can presume-if, in other words, the officer takes actions beyond those that a homeowner has authorized for all visitors- Jardines holds that it is immaterial that the officer might be lawfully present while conducting those unauthorized actions. And although the subjective intent of the officer is irrelevant to the legality of his actions, see, e.g. , Ashcroft v. al-Kidd , 563 U.S. 731, 736, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011), Jardines explained that this means only that "a stop or search that is objectively reasonable is not vitiated by the fact that the officer's real reason for making the stop or search has nothing to do with the validating reason." 569 U.S. at 10, 133 S.Ct. 1409.
The Court returned to this theme in Collins v. Virginia , --- U.S. ----, 138 S. Ct. 1663, 201 L.Ed.2d 9 (2018), in which it considered "whether the automobile exception to the Fourth Amendment permits a police officer, uninvited and without a warrant, to enter the curtilage of a home in order to search a vehicle parked therein." Id. at 1668. No, was the Court's clear answer. In that case, the police believed that a motorcycle parked in defendant Collins's driveway was stolen. One officer went to the house, walked up the driveway to the motorcycle, lifted up a tarp that was covering it, recorded the identifying information, and confirmed that it was indeed stolen.
In light of Jardines , there was no way in which that search could be justified as a warrantless search of the home or its curtilage. Instead, the state tried to shoehorn the search into the so-called automobile exception to the warrant requirement-an exception that developed because of the inherent mobility of the vehicle. The Court rejected that effort, explaining that "the scope of the automobile exception extends no further than the automobile itself. ... Nothing in our case law, however, suggests that the automobile exception gives an officer the right to enter a home or its curtilage *422 to access a vehicle without a warrant." Id. at 1671. It also reconfirmed, in words that this panel should be respecting, that it "already has declined to expand the scope of other exceptions to the warrant requirement to permit warrantless entry into the home." Id. at 1672. It went on to list examples of its commitment to the warrant requirement, including the plain-view doctrine, which requires that "the officer have a lawful right of access to the object itself," id. , and, "absent another exception such as exigent circumstances, officers may not enter a home to make an arrest without a warrant, even when they have probable cause. " Id. (emphasis added).
Here, the majority accepts that the officers lacked probable cause to search the home (or, importantly, its curtilage). Given that deficit, and the uncontested fact that none of the exceptions to the warrant requirement applies here, Officer Milone's act of opening the screen door and looking behind it-which easily qualifies as an intrusion into at least the curtilage, and probably also the home-was forbidden. That act cannot be saved by the implicit license to approach the door, any more than that license saved the dog-sniff in Jardines . The majority observes that "Boyack and Milone were permitted to enter onto the porch without his consent" and that "he consented to the officers' presence on the porch." Ante at 412 n.2. Fine, but unhelpful. The critical fact is that the officers did more than they were invited or implicitly permitted to do when they opened and looked behind the screen door: there was no "invitation to do that ." Jardines, 569 U.S. at 9, 133 S.Ct. 1409. Likewise, it would make no difference if (counterfactually) "Boyack and Milone had articulated objectively reasonable grounds [that is, something grounded in ascertainable facts] to suspect Richmond was engaged in criminal activity that justified their entry onto the porch ." Ante at 413 (emphasis added). They did not need reasonable suspicion to walk up to the porch and talk with Richmond. But they needed more than reasonable suspicion to open the door and thereby conduct a search of the home's curtilage. And that they lacked.
The majority also asserts that "at the moment of the search the officers had no indication Richmond had any Fourth Amendment interest in the home." Ante at 415. Putting aside the fact that the government never argued this issue, the officers' subjective belief about Richmond's own connection to the property (or lack thereof) is entirely irrelevant to the legality of the search or to the availability of the suppression remedy. If it had been another person's home, the government would have so argued, and Richmond would not have been able to demonstrate the necessary interest for a Fourth Amendment claim. Since it was Richmond's home, the government reasonably refrained from any such challenge, thereby forfeiting any argument it might have made. Had the government snooped behind the screen door of another person's house without a warrant or other legal basis for its action, we might right now be facing a case in which that other person's Fourth Amendment rights were violated.
For purposes of the suppression remedy, the operative inquiry is whether the person seeking suppression in fact possesses enough of a connection to the home to trigger the protections of the Fourth Amendment. If the search of the curtilage had turned up something belonging to another resident of the home, such as illegal drugs or child pornography, that other resident would be entitled to contest that search and seek to suppress the evidence. That would be so even though the police had never given any thought to the possibility of another resident or her connection to the property. Here, Richmond does *423 have a Fourth Amendment interest in the home, giving him the necessary interest to contest the search and the right to seek suppression of illegally collected evidence. Rakas v. Illinois , 439 U.S. 128, 134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).
The government might point to United States v. Santana , 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), as support for its position, but nothing in that case is in tension with the later decisions in Jardines and Collins . The only common element is the fact that a person's front porch featured in the facts. Otherwise, everything that is missing here was present there. First, the district court found, and the Supreme Court confirmed, that the police had "strong probable cause" that defendant Santana had just participated in an illegal sale of narcotics. Id. at 41-42, 96 S.Ct. 2406. Second, it found that Santana herself was in a public place as she stood on the threshold of her dwelling, and so, given the existence of probable cause, the police were entitled to arrest her there under the authority of United States v. Watson , 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Finally, even though she briefly retreated into the house, the Court held that the police were entitled to follow her, because the requirements for "hot pursuit" were satisfied. Santana, 427 U.S. at 42-43, 96 S.Ct. 2406. In Richmond's case, there was neither probable cause nor hot pursuit-the two crucial features supporting the result in Santana .
I conclude, therefore, that a straightforward application of Jardines and Collins requires us here to find that the police violated the Fourth Amendment when they opened the screen door, thereby entering and searching the curtilage of Richmond's home in a manner that exceeded the boundaries of any express or implied license. That violation continued when they seized the gun. Because neither a warrant nor probable cause (nor any other exception) protected that entry and seizure, the gun should have been suppressed.
B
Interestingly, my colleagues recognize that there was no probable cause for the search, and that it was the search of a home. In order to salvage Richmond's conviction, they resort to the Terry line of cases to justify their decision. As I now explain, however, they have stretched Terry beyond anything the Supreme Court has ever endorsed.
The first question for Terry purposes is when, if ever, did the police develop a reasonable suspicion that Richmond was violating the law? We can rule out several points. First, as I indicated earlier, at the moment when Richmond was walking along the street in a high-crime neighborhood with a bulge in his front pocket, the police had no support for a reasonable suspicion of any misconduct. Plenty of people are out and about around midnight, after spending an evening with friends, seeing a movie or live show, or working a late shift. Unfortunately, plenty of people also live in neighborhoods with a significant crime problem. They are not confined to quarters, however, and so they are just as entitled to walk around in the evening as anyone else. But, the majority stresses, Richmond had a bulge in his pocket, and the officers, based on their experience, believed that this bulge was a gun. That was, however, at most a guess. It could just as easily have been a couple of beer cans, or a late-night snack, or a book. Reasonable suspicion requires more than educated speculation. And critically, as of that time Richmond had done nothing that a person with a valid firearms license might also have done.
The next suspicious event to which the majority points is the fact that Richmond *424 accelerated his pace when he realized that the police were interested in him. But nothing in the record supports a finding that he turned tail and ran, as was the case in Wardlow . In fact, Officer Boyack acknowledged that Richmond "was not running or sprinting." The majority adopts the government's assertion that Richmond "changed direction" upon seeing the officers, ante at 409, but that purported fact appears nowhere in the district court's opinion nor in the magistrate judge's report and recommendation. It is therefore improper for this court to assume that the officers had an objective basis to suspect a violation of the law because they saw Richmond make an "unusual change of course," id. , at least without making clear that we are finding facts for the first time. Yet the majority bases its finding of reasonable suspicion at least partly on this fact. Ante at 411-12.
Even if we were entitled to consider whether Richmond changed direction, the record support for that proposition is quite weak. There is testimony from one of the officers indicating that Richmond "did change his direction," but the officer elaborated as follows: "First he was walking north. He then went on a - not a hard right but it would be to his right on an angle across the grass which would be to his east." Dkt. 75 at 9-10. It is doubtful whether a person's choice to cut across the grass to reach a home located along his preexisting route-as many people might do at the conclusion of a walk-is best described as a "change of direction." That seems more like a phrase that signals at least a 90 degree turn, if not a 180. It is hardly an "unusual change of course," ante at 408-09, for pedestrians to take this type of shortcut.
A person who keeps on going in the general direction in which he was traveling but accelerates his pace upon making eye contact with a police officer-which is the most that this record establishes-has not done enough to give rise to reasonable suspicion. It is not hard to imagine that this person might want to avoid a late-night chat with the police, especially given the notoriously fraught state of community-police relationships in many cities. Gallup reported a few years ago that confidence in the police is at its lowest level in 22 years. See Jeffrey M. Jones, "In U.S., Confidence in Police Lowest in 22 Years," Gallup News, at https://news.gallup.com/poll/183704/confidence-police-lowest-years.aspx. A chart in that article shows that this problem is especially severe among African-Americans, only 30% of whom reported in 2014-15 that they had either "a great deal" or "quite a lot" of confidence in the police.
This leaves Richmond's act of placing the object behind the screen door when he reached the porch. That one act does not suffice to support reasonable suspicion, in my view, even taking into account the fact that a person with a valid firearm license presumably would not mind being found with the weapon. As of this time, the police had nothing but a "hunch" that the item was a gun, rather than a package that Richmond wanted to tuck away before his encounter. (If this were a drug case, would the police have insisted that they suspected that Richmond was carrying a brick of cocaine?) A person in a high-crime neighborhood is very likely aware that the police have been known to make mistakes about objects, with tragic results. The act of stashing the unknown package thus does not salvage an otherwise inadequate case for reasonable suspicion. I will not dignify with any response the government's effort to squeeze reasonable suspicion out of the fact that Richmond was "a large, muscular man who stood unrestrained within a couple strides from where he concealed" what hindsight proved to be a gun. The majority *425 lists this fact as evidence substantiating the officers' concern for their safety. Does this mean that large, physically fit men can be searched at will, in the name of officer safety? I hope not. Yet the government cites Richmond's appearance as one of "at least five articulable facts [that] support[ed] their suspicion." It does not.
And even if this thin set of facts were enough to justify a working assumption that Richmond had a gun, so what? Generally speaking, to justify an investigatory stop, the police must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Navarette v. California , 572 U.S. 393, 396, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014), citing United States v. Cortez , 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Mere possession of a firearm in a high-crime area-assuming for a moment that the police had an adequate basis for even this conclusion-is not good enough. See United States v. Watson , 900 F.3d 892, 896-97 (7th Cir. 2018). As we pointed out in Watson , "[p]eople who live in rough neighborhoods may want and, in many situations, may carry guns for protection. They should not be subject to more intrusive police practices than are those from wealthy neighborhoods." Id. at 897.
The police did not have the necessary reasonable suspicion to frisk Richmond, had they accosted him before he reached his front door, and they made no effort to do so. Even if they did, they knew that he was no longer carrying the mystery package; for officer safety, they could have escorted him to the squad car, far from the package, and gone about their business. I am aware of no authority that endorses the conduct of a Terry - like "frisk" not of a person, but of a home or its curtilage. Any kind of search of the home or curtilage on less than probable cause (supported by a warrant, normally), or without one of the recognized exceptions such as hot pursuit, is forbidden by binding Supreme Court precedent, notably Jardines and Collins .
I would therefore reverse the district court's decision to deny Richmond's motion to suppress and return this case to that court for further proceedings. I thus dissent from the majority's decision.