# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00534-CR

**Orvis Davis, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE COUNTY COURT AT LAW NO. 2 OF HAYS COUNTY
### NO. 20-3951CR-2, THE HONORABLE CHRISTOPHER P. JOHNSON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Orvis Davis challenges the trial court's denial of his pretrial motion to suppress evidence obtained as a result of an allegedly illegal detention, arrest, search and seizure of his person and property. After the motion was denied, Davis waived his right to a jury trial and pleaded no contest with the provision that he could challenge the denial of his motion. The trial court found Davis guilty of driving while intoxicated and assessed punishment at 180 days in jail and a $500 fine, suspended for a term of community supervision of eighteen months. *See* Tex. Penal Code § 49.04. Davis urges that the trial court erred by denying his motion to suppress. We will affirm the judgment of conviction.

## APPLICABLE LAW

"We review a ruling on a motion to suppress using a bifurcated standard of review." *Sims v. State*, 569 S.W.3d 634, 640 (Tex. Crim. App. 2019) (citing *Guzman v. State*, 955 S.W.2d 85, 87-91 (Tex. Crim. App. 1997)). When reviewing a trial court's decision to deny a motion to suppress, we afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Montanez v. State*, 195 S.W.3d 101, 106 (Tex. Crim. App. 2006). That deferential standard applies even when the trial court's determination of historical facts is based on a recording admitted into evidence. *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013) (quoting *Montanez*, 195 S.W.3d at 109). But when evidence is conclusive, such as a written and signed agreed stipulation of evidence or "indisputable visual evidence," then any trial-court findings inconsistent with that conclusive evidence may be disregarded as unsupported by the record. *Miller v. State*, 393 S.W.3d 255, 263 (Tex. Crim. App. 2012) (citing *Tucker v. State*, 369 S.W.3d 179, 187 (Tex. Crim. App. 2012) (Alcala, J., concurring)). We afford the same deference to trial court's rulings on mixed questions of law and fact if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Montanez*, 195 S.W.3d at 106. But we review de novo the resolution of mixed questions of law and fact that do not turn on an evaluation of credibility and demeanor. *Id.*

We view the evidence in the light most favorable to the trial court's ruling, *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014), and that ruling will be sustained if it is correct on any applicable theory of law and the record reasonably supports it, *State v. Ruiz*, 581 S.W.3d 782, 785 (Tex. Crim. App. 2019). The trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross*,

2

32 S.W.3d 853, 855 (Tex. Crim. App. 2000). Accordingly, the judge may believe or disbelieve all or any part of a witness's testimony, even if that testimony is not controverted. *Id.* Where a trial court does not enter any findings of fact when denying a defendant's motion to suppress, we view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record. *Montanez*, 195 S.W.3d at 106. As the prevailing party at the trial level, the appellee—here, the State—has the benefit of deference on factual findings made in its favor. *See State v. Ford*, 537 S.W.3d 19, 23 (Tex. Crim. App. 2017).

Whether the facts, as determined by the trial court, provide reasonable suspicion or probable cause to support a search or seizure under the Fourth Amendment is a legal question to be reviewed de novo. *See id.*; *Byram v. State*, 510 S.W.3d 918, 923 (Tex. Crim. App. 2017). Under the law of search and seizure, the reasonable-suspicion standard applies to "brief detentions which fall short of being fullscale searches and seizures." *Woods v. State*, 956 S.W.2d 33, 35 (Tex. Crim. App. 1997); *see also Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005) (applying reasonable-suspicion standard to traffic stop). Under this standard, "a police officer can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *Woods*, 956 S.W.2d at 35 (quoting *Terry v. Ohio*, 392 U.S. 1, 29 (1968)); *see also Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (explaining that for reasonable suspicion to be present, officer must be able to state more than hunch or unparticularized suspicion of criminal activity). The suspicion must be more than an inarticulable hunch or intuition that something criminal has happened. *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010).

The reasonableness of a temporary detention must be examined in terms of the totality of the circumstances. *Woods*, 956 S.W.2d at 38. This is an objective standard that disregards any subjective intent of the officer. *Ford v. State*, 158 S.W.3d at 492. An individual is not "seized until he has yielded to a law enforcement officer's show of authority or when officers physically limit his movement." *Johnson v. State*, 912 S.W.2d 227, 234 (Tex. Crim. App. 1995).

## TESTIMONY AND EVIDENCE

The trial court heard testimony from the arresting officer and portions of the officer's body-camera recording of his encounter with Davis that were admitted into evidence. A friend of Davis's testified regarding his regular mode of speaking.

San Marcos Police Department Officer Christopher Wooten testified that he responded to a request for assistance to 911 from Davis. Initially patched into the telephone call, Wooten drove to the location Davis said he was because, Wooten said, "I was trying to talk about it over the phone, but we were getting nowhere." Wooten testified that he did not activate his police car's lights, parked on the street and not near Davis, did not take out his duty pistol, did not shine any light on Davis's truck, and did not call for or receive any backup. Wooten testified that he did not approach Davis to conduct a DWI investigation. He said he was trying to figure out what Davis's complaint was. Wooten said that Davis was talking "about money, that somebody owed him child support." Wooten testified that he said the complaints sounded like civil matters that the police could not help resolve. Wooten said he suggested steps Davis could take to handle the civil matter. He said he did not block Davis in, though he did ask Davis for identification. Wooten said that during the discussion he stood about a person's length away

4

from the passenger door. He did not walk to the driver's side. Wooten testified that from that position he could not smell any odor of alcohol and did not notice anything about Davis's eyes until he got out of the truck.

Wooten said he noticed Davis had slurred speech and an inability to comprehend what Wooten was saying. Wooten described Davis's speech as "almost slobbering at the end of the words." Wooten also testified, "He just wasn't comprehending and we continued to go round and round." Wooten said that these qualities persuaded him to get Davis out of the vehicle and continue to talk to him to see if there were any other signs of intoxication. Wooten said he saw such signs after Davis exited the truck, but Davis's complaint—and thus our inquiry—focus on the period leading up to Davis's exit and whether the events that preceded his exit provided reasonable suspicion for a temporary detention.

On cross-examination, Davis questioned Wooten's observation of his eyes. Wooten testified that he could not see Davis's eyes in the truck because it was dimmer. Davis asserted that Wooten wrote in his report[1] that he observed Davis's eyes as bloodshot before he "ordered him out of the car." Wooten responded, "I'm writing the report based on my observations later on, but his speech was slurred." Though Davis contended that the video showed his eyes were not bloodshot, Wooten testified that bloodshot eyes are easier to see in person than on video. Wooten said he was given typical responses to the questions he asked. Davis contended that Wooten ordered him out of the truck because he said, "Come on. Come on out." Wooten responded that "that's probably another way of asking him to get out of the car." Davis asked, "when someone says, Come on, get out, that has—as a peace officer with a weapon

---

[1] Davis argued that Wooten's testimony conflicted with his report. The report was not offered or admitted into evidence. The only proof of its content was the testimony about it.

5

on him, would you consider that more of a request or an order?" Wooten responded, "A request."

At the beginning of the body-cam video, Officer Wooten was driving and on the phone with Davis. Wooten said Davis had told him he was at Black's Barbecue, but was not there when Wooten arrived. Davis told him he was nearby at his employer's headquarters—a tow truck yard. Wooten parked on the street and walked into the yard but was uncertain which vehicle belonged to Davis. At some point, the phone call apparently disconnected while Wooten walked around for a short time looking for Davis. After reconnecting and confirming which vehicle Davis was in, Wooten told Davis, "I'm right here, if you want to step out for me." Davis did not get out of the truck, and Wooten approached the passenger's side of the vehicle. Wooten asked what the problem was, and Davis showed him documents concerning an employer withholding child support but the funds not being received or credited by the State's child-support division. When Wooten said the issue sounded like a civil matter, Davis said he had been told by a Caldwell County authority to contact "one of y'all's office." Wooten repeatedly told Davis that his civil matter was not something that a police officer could resolve. Wooten asked twice, "Do you understand that we don't handle these kinds of calls?" When Davis continued to discuss his complaint, Wooten asked, "Have you been drinking today, sir?" Davis said no but that he wanted to understand his rights.

Wooten asked for Davis's identification, and Davis provided his driver's license and continued to talk about the issue. Davis said he thought there was going to be a peace bond between him and his employer and that it seemed like "whatever they say goes even though if they're in the wrong." Wooten responded, "That's their business, I can't, I can't, I can't make them—" and Davis interjected, "I done been to Houston, you know what I'm sayin', and I, I,

6

more or less know how that situation works, you know, uh, uh, the green giants, jolly green giants, or whatever, you understand, but I'm not tryin' to get into that part, but I'm trying to feel and figure out what's right and what's wrong." Wooten said, "OK. Come here real quick, come here" and waved toward the back of the truck. Davis got out of the truck and walked to the back of the truck. Wooten said, "Sir, I'm gonna ask you 'cause I'm noticing the way you're talkin', the way that you've been—how much have you had to drink today?" The continuation of the encounter after that point is beyond the scope of the reasonable-suspicion issue raised on appeal.

A longtime friend of Davis's testified that Davis's speech was his normal speaking pattern, not slurred by intoxication. The friend had been friends with Davis's father, had known Davis for twenty years, and had socialized and worked with him. Davis had recently attended his church's Bible study and helped him move. The friend testified that, as a result, he knew Davis's speech patterns. The friend watched the body-camera footage and said that Davis's speech was not impaired or affected at all. The friend admitted to being twice convicted of DWI and having recently completed probation for possession of a controlled substance, but testified that he had no reason to lie about Davis.

**DISCUSSION**

By his sole issue, Davis contends that the trial court erred by denying his motion to suppress evidence. He contends that Wooten's testimony that Davis's speech was slurred was undermined by both Wooten's testimony that he did not have trouble understanding Davis and Davis's friend's testimony that Davis's speech on the video was his normal mode of speech. Davis argues that Wooten lacked credible specific, articulable facts supporting a reasonable suspicion of criminal activity when he ordered him to get out of his truck.

7

We conclude that the totality of the circumstances support the trial court's denial of the motion to suppress.[2] *See Woods*, 956 S.W.2d at 38. The trial court observed the witnesses and the audiovisual recording of the encounter from Wooten's body camera. We must view the record in the light most favorable to the trial court's findings regarding Wooten's observations unless the video provides indisputable evidence to the contrary. *See Montanez*, 195 S.W.3d at 106. The trial court could resolve conflicting evidence about whether Davis's speech was slurred in favor of an implied finding that it was slurred—especially because the trial court heard Davis on the body-camera recording. Wooten testified that Davis had trouble explaining where to find him and Davis persisted in discussing his problem when told repeatedly that police were not able to address it. Though Wooten at one point said "yes" when asked whether he was given "typical responses to the questions you were asking," the court could have discounted that response in light of Davis's last statement; when Davis's narrative meandered into a mention of the jolly green giant, Wooten responded by requesting/ordering Davis to exit the truck.

The record supports an implied finding that Davis's statements plus his slurred speech prompted more than a hunch and provided specific, articulable facts that gave rise to a reasonable suspicion that Davis lacked the normal use of his mental faculties by reason of the introduction of a substance into the body. *See* Tex. Penal Code § 49.01(2)(A) (defining intoxication). Combined with the operation of the vehicle, Davis's actions gave rise to a

---

[2] For purposes of this discussion, we will assume without deciding that Wooten's conduct constituted a show of authority that restrained Davis sufficiently to constitute temporary investigatory detention. We note, however, that Davis ignored Wooten's initial request for him to exit his vehicle with no adverse consequences. Though the second request was somewhat more directory, it was not accompanied by a show of force or a loud tone of voice. Nevertheless, because the hearing focused on factors related to reasonable suspicion at the time of Davis's exit from the truck, we will focus on that issue.

reasonable suspicion that criminal activity might have occurred—namely, that Davis had driven while intoxicated. We overrule Davis's sole issue.

## CONCLUSION

We affirm the trial court's denial of Davis's motion to suppress evidence.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Smith and Theofanis

Affirmed

Filed: August 15, 2024

Do Not Publish

9